WILLIAM F. ZACHRITZ v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant.—81 S. W. (2d) 608.

Division Two, March 30, 1935.

*E. T. Miller, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

*W. W. McCanles* and *Hogsett, Smith, Murray & Trippe* for respondent.

WESTHUES, C.—This case, coming to the writer on reassignment, is an appeal from a judgment, in the amount of $20,000, against appellant railroad company and in favor of respondent. Respondent,

Zachritz, based his suit upon an alleged violation, by appellant, of the Federal Safety Appliance Act, the Boiler Inspection Act, and also upon common-law negligence under the Federal Employers' Liability Act.

Appellant seeks an outright reversal of the judgment on the theory that the evidence failed to prove either a violation of the Safety Appliance Act or the Boiler Inspection Act or negligence. Zachritz was a locomotive engineer employed by appellant. On May 15, 1930, the day he received his injuries, he was in the yards at West Tulsa, Oklahoma, switching freight cars carrying interstate freight. Respondent was, therefore, engaged in work connected with interstate transportation. He went to work at four P. M. on the day in question and intended to work until twelve midnight. At about eleven-thirty he left his engine for a few minutes on a private errand, leaving the fireman of the crew temporarily in charge of the engine. While plaintiff was absent a signal was given to move the engine forward. The fireman, in compliance with this signal, moved the engine forward at a rate of speed, estimated by witnesses, of from four to six miles per hour. Zachritz attempted to catch the engine and board it on the fireman's side. In doing so he took hold of the handrail of the tender with his right hand and attempted to step on the lower step leading to the cab. For some reason he fell under the engine, or tender, and injured his leg to such an extent that it became necessary to amputate it between the foot and knee. Respondent also complained of injuries to his spine.

Respondent maintains that the evidence was sufficient to sustain the charge of a violation of the Safety Appliance or Boiler Inspection Acts in that there was evidence showing the handrail to be extremely slick due to wear and long and continued use. It is also urged that the charge of negligence was sustained because it was shown that there was grease and oil on the handrail which caused it to be slick. These questions in the order stated.

Respondent testified that as he attempted to board the engine his hand slipped downward on the handrail about two feet causing him to miss his step and fall under the tender of the engine. Respondent's evidence utterly fails to show any defect whatever unless it can be said that a smooth, slick handrail must be considered defective. Considering the uses to which handrails are put and the purpose for which they are required to be placed on tenders and engines it cannot be said that a slick handrail is defective. Note the testimony of respondent's witnesses, who were members of the crew at the time he was injured. Higgenbothem, the fireman, testified:

"Q. Just tell the jury what kind of a hand-iron was on that tender and cab, how large they were and all about it? A. It was a standard

cab-iron so far as I know, I couldn't tell, it was just like any other iron. . . .

"Q. How did the iron look at that time? A. It looked just like any other iron does.

"Q. What do you mean? A. I mean the grab iron, I believe as I stated before that grab irons always have more or less grease and dirt on them and it didn't look bright.

"Q. This was more bright than others? A. It was cleaner than usual.

"Q. Had it been cleaned just before you started using it? A. I don't know.

"Q. Was it smooth? A. It looked smooth to me.

"Q. Who asked you to look at this particular grab iron? A. Mr. Bowen.

"Q. Who? A. One of the foremen.

"Q. Did you make a casual inspection of it? A. I just looked at it.

"Q. In going down as a switchman and you as fireman, when you go down do you use a customary hold on the grab iron? A. That depends on whether or not we are in a hurry.

"Q. If you are in a hurry? A. We just grab on and swing off and slide down the iron.

"Q. That is when you are in a hurry? A. Sometimes we go down with one hand and sometimes with both.

"Q. But when you are just going down? A. We usually use the steps and just slide our hands down."

George Wade, a switchman, was asked how the handrail was used and he testified in part as follows:

"Q. How did you get down? A. I just grabbed and slid down.

"Q. Is that the customary way for a switchman and engine men to get out of an engine, to slide down? A. Yes, sir, if they are in a hurry it is, if those irons are in fairly good condition you can slide down them.

"Q. Did you observe the grab iron on that tender that night, which way did you get off? A. On the fireman's side it was.

"Q. Did you observe that it was smooth? A. I didn't observe. I couldn't say, I didn't tear my hand or glove and I would presume that they were in good condition so far as I know."

Respondent testified in part as follows:

"Q. Tell the jury whether or not when you got off the fireman's side of the engine you slid down? A. Yes, sir.

"Q. Did you at that time observe this particular handrail? A. No, sir. I slid down the right handrail.

"Q. Explain how you did that? A. I just placed my hand on the right handrail and used the step and slid down.

"Q. Was that the customary and practical way of getting down? A. I generally get down any way.

"Q. You slid down like a fireman does at the call of fire? A. I just slid down the handrail.

"Q. You slid down the handrail *and the*" (as a) "fireman would slide down a pole? A. And I had on gloves.

"Q. When you grabbed that iron you expected to slide down didn't you, and by sliding you expected it to become slick? A. Yes, sir, I suppose so."

The rules of the Interstate Commerce Commission, concerning the dimensions of handholds, read as follows:

## "SIDE HANDHOLDS

"Number:

"Four (4).

"Dimensions:

"Minimum diameter, seven-eighths (7/8) of an inch, wrought iron or steel.

"Clear. length equal to approximate height of tank.

"Minimum clearance, two (2), preferably two and one-half (2½), inches.

"Location:

"Vertical. One (1) on each side of tender near front corner; one (1) on each side of locomotive at gangway.

"Manner of application:

"Side handholds shall be securely fastened with bolts or rivets."

Respondent also testified that the handrail "was as slick as grease" and that in addition to being slick "it had oil on it." He also testified that about a month prior to the accident he made complaint to one Thomas, the foreman of the roundhouse, that the handhold was in a dangerous condition. The evidence disclosed that Thomas died prior to the date of the trial. It was also shown that it was a custom, and under the rules an engineer was required, upon finding a defect, to make a written report thereof on the forms furnished daily for that purpose. Respondent admitted he never made a written complaint of any defect existing in the handhold.

A witness for plaintiff, named Concannon, testified that he had seen handholds that were made capulary in order to afford a firmer grip, also that long years of use would make them smooth. He also testified that handholds were frequently painted.

Appellant adduced testimony, by a number of witnesses, that the handhold in question, which was introduced in evidence, was similar to the handholds ordinarily used in railroad service; that handholds as a rule are smooth and are supposed to be so.

Considering this evidence from every angle and in the light most favorable to respondent we are constrained to hold that it failed

to prove the existence of any defect in the handhold. The evidence introduced by respondent showed that smooth handholds are in general use in railroad service. Considering also the use made of the handholds by the railroad employees, particularly that of sliding down from the cabs, it would seem that a smooth or slick handhold would be as safe if not safer than one that is rough. It will be noted that the Federal Boiler Inspection Act requires the appliances to be "in proper condition and safe to operate *in the service to which the same are put,* that the same may be employed in active service of such carrier without unnecessary peril to life or limb." (Italics ours.) The operation of a railroad is necessarily attended by some danger. It would be impossible to so equip the engines and cars as to eliminate all danger of employees being hurt. The Safety Appliance and Boiler Inspection Acts do not contemplate this to be done. As long as railroads are operated employees will, from time to time, fall from the cars and engines and otherwise be injured. That they do so does not of itself mean that the company has violated the Safety Appliance or Boiler Inspection Acts or that anyone has been negligent. In order for an injured party to recover under the Federal Acts he must introduce substantial evidence of a defect or show that an appliance failed to function and by reason thereof he was injured. [Fryer v. St. Louis-San Francisco Ry. Co., 333 Mo. 740, 63 S. W. (2d) 47, l. c. 52 (5); Riley v. Wabash, 328 Mo. 910, 44 S. W. (2d) 136; Baltimore & Ohio Railroad v. Groeger, 266 U. S. 521, 45 Sup. Ct. 169, 69 L. Ed. 419; Henry v. Cleveland C., C. & St. L. Ry. Co., 332 Mo. 1072, 61 S. W. (2d) 340, l. c. 341 (1-3) and Federal cases there cited.] The cases, cited by respondent, holding that a showing made of the failure of an appliance to work efficiently will sustain a charge of the violation of the Safety Appliance or Boiler Inspection Acts, do not apply in this case. Had the handhold been loose, broken, or bent, those cases would be in point. The fact that respondent's hand slipped on the handhold was no evidence that the handhold, as such failed to fulfill its proper function.

Respondent has cited many cases holding that smooth, slick steps, made so by long usage, are considered dangerous. In cases against railroad companies such steps have been declared unsafe and recovery has been permitted under the Federal Acts. There is, however, a vast difference between steps and handholds. Steps are so constructed that they afford a firm footing through friction, while handholds, as a rule, are smooth and intended to be utilized by grabbing with the hands and holding, or grabbing and permitting the hand to slide and yet retain a firm hold, as is done when sliding down. All of the witnesses in this case were in accord that in walking up and down the steps of an engine it was customary to slide the hands up and down on the handhold. Often the steps were not used at all and the

employees would slide down the handrail. This was frequently done when the employees were in a hurry. This evidence refutes, we think, the argument that a defect existed by reason of the fact that the handhold was smooth or slick by long usage.

Respondent also states that the handhold was defective because it was only three-fourths of an inch in diameter. This, however, is not strongly urged and there is no merit in the contention. The only evidence to this effect was given by respondent when he was asked the following question:

"Q. About what was the size of the iron? A. It was about three-fourths of an inch, maybe smaller, I couldn't say."

Another witness for plaintiff testified the iron was about an inch or more in diameter. The actual measurement of the iron showed that it was an inch in diameter. It is clear, from the evidence, that the answer of respondent, as to the thickness of the iron, was a mere guess and the statement that it was about three-fourths of an inch did not give the definite but only the approximate size. Three-fourths of course equals six-eighths. By the rules of the Interstate Commerce Commission the iron was required to be only seven-eighths of an inch. We hold that there was no substantial evidence showing a defect in this regard.

■ Was the evidence sufficient to sustain a charge of negligence? This of course pertains to the presence of oil on the handrail. Respondent testified in part as follows:

"Q. I think that you said there is always more or less oil on a grab iron? A. Yes, sir, more or less.

"Q. And you had observed this fact as being an engineer over a considerable period of years? A. Yes, sir.

"Q. When you went to work after noon on that day of the accident did you observe any oil on either of the grab irons or on the tank attached? A. No, sir.

"Q. And you didn't observe any at any time prior to the accident? A. No, sir. . . .

"Q. You tell this jury that when you went to work at four o'clock this handrail seemed clean? A. Yes, sir.

"Q. And you took charge of the engine, that handrail or grab iron seemed clean and in perfect condition? A. It looked that way to me.

"Q. Now let's take this step by step and get it clear—you tell the jury that when you took charge of the engine about four o'clock in the afternoon and oiled the engine you observed that this grab iron seemed to be clean and in proper condition?

"MR. McCANLES: He has answered that three times. . . .

"Q. You said something about oil on this handrail, tell the jury how you know that this had oil on it? A. Well, there was some oil on my glove at the time I was hurt.

"Q. Where was the oil? A. In the palm of the hand and it was on the glove where my hand was on the rail.

"Q. When did you observe this on your hand? A. Right after I fell, I looked to see what had made me fall.

"Q. Did you, Bill, wear gloves all the time working there? A. Continuously.

"Q. What kind of gloves? A. Gloves with a leather palm."

Respondent also testified that a short time prior to his injury his gloves were dry and at no time prior to the accident did he notice any oil on the handrail. Witnesses for respondent testified that grab-irons or handholds, about the tenders and engines, generally have more or less oil, grease and dirt on them. Respondent testified that employees, working about the engine, carry a piece of waste with which they wipe oil and grease off their gloves and clothing.

It will be noticed from the above testimony that when respondent took charge of the engine in question the handhold was clear from oil. No negligence could, therefore, be charged to appellant in permitting oil to be left upon the handhold when the engine was delivered to respondent. The question remains, does the evidence justify a finding that appellant, through its servants, was negligent in permitting oil to accumulate upon the handhold during the time the engine was under the care and in charge of respondent? In passing upon this question we must keep in mind that there was no evidence of any large amount of oil or grease on the handhold, but only such an amount as, under respondent's own evidence, would ordinarily and usually be found on the handrails of a switching engine. That oil and grease necessarily accumulate upon the handholds of an engine may be deduced from respondent's evidence that the handholds were frequently cleaned by scraping them with putty knives. This was usually done at the roundhouse when the engine was not in use. Analyzing the evidence, we fail to find wherein it tends to prove negligence on the part of anyone. This case is entirely unlike the case of Cole v. St. Louis-San Francisco Ry. Co., 332 Mo. 999, 61 S. W. (2d) 344, cited by respondent, wherein the plaintiff proved that an unusual amount of grease was left upon a rung of a ladder of a tank car and caused the plaintiff to fall. The grease it was shown was upon the rung when the plaintiff went to work. The train started from Pensacola, Florida, the southern terminus of the railroad. The court in its opinion said:

"The court refused to submit the case to the jury on the theory of a violation of the Federal Safety Appliance Act (45 U. S. C. A., par 1, et seq.), but submitted it on the theory of defendant's negligence under the Federal Employers' Liability Act (45 U. S. C. A., pars. 51-59). Under the last-named act it was charged that oil or grease was negligently on the rung of the ladder before the car left

Pensacola, and had been there for a sufficient length of time for defendant, by the exercise of ordinary care, to have discovered and removed it.''

After reviewing the evidence the court said:

''We think this evidence excludes, as far as possible, every probability of oil or grease having been placed on the bottom rung of the ladder during the movement of the train from Pensacola to Kimbrough.''

The main negligence relied upon was a failure to inspect the cars at the terminal.

Since we have concluded that plaintiff failed to sustain a violation of the Safety Appliance or Boiler Inspection Acts or a charge of negligence it will not be necessary to consider other questions in the case.

The judgment of the circuit court is, therefore, reversed. *Cooley* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.