Arthur A. WEINELL

v.

**McKEESPORT CONNECTING RAILROAD COMPANY, a Corporation, Appellant.**

**No. 17380.**

United States Court of Appeals Third Circuit.

Argued Jan. 7, 1969.

Decided June 4, 1969.

James R. Orr, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellant.

Paul E. Moses, Evans, Ivory & Evans, Pittsburgh, Pa. (Robert B. Ivory, Pittsburgh, Pa., on the brief), for appellee.

Before BIGGS, FORMAN and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

The plaintiff-appellee, Weinell, brought this suit pursuant to the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq., to recover for personal injuries allegedly sustained during the course of his employment as a brakeman by the McKeesport Connecting Railroad Company. Following a jury verdict and judgment in favor of Weinell in the amount of $124,500 the Railroad filed a motion for a new trial. The motion was denied and this appeal followed.

It appears from the evidence that in the late afternoon of November 5, 1965, Weinell slipped on flue dust on one of the Railroad's tracks and in trying to right himself wrenched his back, causing injury in his neck area.[1] The jury could have found that the accident caused severe restriction in the back and neck areas, causing him to be disabled from further service as a brakeman. Dr. Sherman, an orthopedic specialist called on Weinell's behalf, stated that Weinell had prior operations for minor injuries but these apparently were not connected with his employment or related to the injuries in his back or neck areas. Following the November 5 accident, Weinell was advised by his foreman to report to the National Tube Mill Hospital, where he received some treatment. The next day he was examined by the Railroad's physician, Dr. Markle, who had him admitted to the West Penn Hospital.

Weinell remained in West Penn Hospital for about two weeks and, because he considered his condition not to have improved, he consulted Dr. Laing on his discharge. Dr. Laing testified that "[T]here is a stiffness in * * * [Weinell's] neck in all ranges of motion, and also * * *. all movements of the cervical spine and dorsal spine would produce pain." There was also evidence of recurrent muscle spasms. All the experts agree, however, that there were no injuries to Weinell's neurological and vascular systems and that tests in these fields were negative.

Compounding the adverse effects of the accident was the fact that Weinell on psychological tests "came through on the low side of average in terms of intelligence." Evidence given by Dr. Pochapin, a psychiatrist and Weinell's witness, was that because of Weinell's psychological condition the injury throwing him out of work was traumatic. Dr. Pochapin stated that Weinell was suffering from an "anxiety reaction which was chronic, severe and came as a result of injury." Dr. Tabachnick, another psychiatrist testifying on Weinell's behalf, went "one step further" than Dr. Pochapin and stated that Weinell was suffering a "conversion reaction" which, if untreated, would result in severe states of depression.

There was substantial agreement among the doctors respecting Weinell's permanent disability although there was testimony from Railroad's doctor that the "best thing" Weinell could do would be to return to work without delay and to "stay away from doctors". A letter from Dr. Pochapin to Weinell's counsel was read into the record to the effect that Weinell was permanently disabled. Dr. Sherman, an expert on rehabilitation, testified that Weinell's accident-related emotional problems without more would prevent his return to work.

The foregoing does not purport to be a complete résumé of the evidence but is sufficient to permit the disposition of the appeal at bar.

The Railroad raised a number of issues some of which in view of the fact

---

1. The Railroad admits to this version of the accident. See its answers to Plaintiff's Interrogatory No. 32.

that the judgment below will be reversed need not be adjudicated in this opinion. For example the Railroad insists that the trial court erred in refusing to permit it to cross-examine Mrs. Weinell when it was discovered that Weinell himself would not take the witness stand. Since this issue is most unlikely to come before the court on the new trial, we deem it unnecessary to adjudge it. The Railroad also claims that Judge Dumbauld erred in refusing to instruct the jury that the Federal Employers' Liability Act was not the only method by which Weinell could recover damages or be paid for an on-the-job injury. The Railroad insists that this charge was necessary to counteract words used by Weinell's counsel in his opening to the jury, as follows: "Now this Federal Employers Liability Act provides the only method by which a railroad employee who is engaged in interstate commerce may recover damages or be paid for an on-the-job injury while he was at work for the Railroad." The statement was obviously an improper one and should not have been made by Weinell's counsel and we assume it will not be made again. The sole issue was the Railroad's liability to Weinell under the FELA and the amount, if any, of his recovery. Nothing else was pertinent. We deem it unnecessary under the circumstances to comment further upon the Railroad's desire for a saving or precatory charge.

The issue of the contested motion pictures taken by Batchen, the Railroad's agent, of Weinell's activities requires some discussion. The pictures were taken while Weinell was moving from one home to another and show him engaging in activities appropriate to home moving, such as lifting objects, bending, turning his head, and getting in and out of his car. The pictures tend to impeach the testimony of Mrs. Weinell and some of Weinell's experts. The trial court, relying upon Rule 5 II G, Rules of Court, United States District Court for the Western District of Pennsylvania, limited the showing of the motion pictures to what it deemed proper upon rebuttal and the court also concluded that

certain frames should be omitted as irrelevant. The limitation upon displaying the pictures to the jury imposed by Rule 5 II G we assume will not arise upon the new trial. As to the elision of frames, while we concede that some, a very small portion of the total, were irrelevant, nonetheless we deem this to be too *de minimis* a matter to require cutting and splicing and that no damage will result to justice in showing all these pictures to the jury.

We come now to the substantial error in the proceedings, the supplemental charge. The jury was originally charged at about 10 a. m. on Thursday, December 14, 1967. The record is not clear as to the time they were discharged on that day but at 10 a. m. on Friday, December 15, no verdict had been reached. There was some delay due to the illness of a woman juror but at 11:43 a. m. on the morning of December 15, the court gave the following supplemental charge to the jury. We set out a good portion of it in order to do justice to the learned trial Judge. It is as follows:

"Ladies and gentlemen of the jury, I think probably the time has now come to give you a few words of encouragement in the course of your difficult and arduous labors.

\* \* \* \* \* \*

"It is not a surprise in view of the complexity and length of the trial that we have just experienced that it will take some time for you to sort out everything and come to a conclusion that is satisfactory to all of you.

"I always say that a jury is entitled to as much time as the lawyers have had in trying the case, in fact you really ought to be entitled to six times as much time as it took the lawyers because there are twelve of you and only two of them, and maybe I should not also say that when there are so many ladies present, why it is likely to be a longer discussion \* \* \*

\* \* \* \* \* \*

"But I feel sure that with your conscientious and diligent effort you will be able to reach such a conclusion warranted by the evidence that you have

listened to so patiently and attentively during the past week.

"Now as I have indicated before, I am a very strong believer in the efficacy of the jury system. I think it is one of our prized features of our system of Government. It is a guarantee provided for in our Constitution. It has been inherited from our ancestors throughout the generations, and I think it is a better system of determining the truth, a matter of importance to all of you, than any other system that could be devised.

"In some other countries that do have different systems, they will have public officials who decide cases. But there is really in my judgment no better method than that of having a jury of people who are selected because they are qualified and impartial and have no interest in the outcome of the case and who after conscientiously performing this important public service return to their daily lives and are not professional jurors or making a career out of working in this type of activity. But it is a public service that we are called upon to perform as citizens, and it is one of utmost importance to the preservation of our system of Government and the administration of justice.

"*And now if a jury is unable to reach a verdict that is satisfactory, it seems to me that that constitutes a black eye on our system of Government. It is really an encouragement to the Communists and the other people who would like to overthrow our system of Government. If the jury system breaks down, why it indicates that our governmental system is developing weak spots, and I personally would hate to think that such a time would ever come when a group of reasonable jurors are gathered in and take upon themselves the important service as citizens of serving on a jury and are unable to discharge the duty that they have undertaken.* (Emphasis added.)

"Now, as I said, the time that you have had is not very long considering the length and difficulty of the case. But it is important in a matter of this kind that each of you show the proper deference and courtesy and consideration for the opinions of others. It is important and vital to the success of the jury system that the verdict be based upon careful thought and discussion and deliberations and not upon arbitrary fiat or anybody being obstinant or cherishing a higher regard for his own opinions than he ought. He cannot be opinionated and obstinant but must give attention to the opinions of others.

"So a system that is often recommended where there is some difficulty being experienced is to just go around in turn and in rotation and each of you discuss your views as to all the issues that are involved in the case, and then everybody else listens quietly and try to give full weight to what that one is saying, and then the next one in turn and so on until you have had everybody's views thoroughly put on the table so to speak and before you, and then begin your discussions among yourselves and point out things that impress you that someone else may have overlooked and so on, so that by this process of careful consideration of all the evidence in the case you will know that you have conscientiously done your duty and not overlooked anything and have given careful heed to the opinions of one another and not tried to be bossy or arbitrary or dogmatic, opinionated or obstinant, but have exercised all the common sense and good judgment which you bring with you in representing a cross section of the American public, and as citizens performing an important part in maintaining the honor and repute of our system of administering justice.

"I feel confident that with necessary time and effort you will be able to agree upon a conclusion that will be satisfactory to all of you.

"So now you may resume your deliberations and we will be in recess."

The jury retired to deliberate. The court then said: "Both sides are noted an exception to everything that has been said by the Court." At 12:45 o'clock p. m., the jury returned with a verdict

in favor of the plaintiff in the sum of $124,500.

It will be observed that counsel for the Railroad and for Weinell were granted exceptions to the supplemental charge. The portions of it which we consider objectionable have been italicized. The "Communists" have and have had nothing to do with this case. The failure of a jury to arrive at a verdict may be troublesome to the court, to counsel, and to the parties, but such a result is a well recognized incident of juridical life in the United States. If a jury does not arrive at a verdict it does not mean that its members favor Communists or that the failure to arrive at a verdict will aid the Communist Party. To put pressure upon members of a jury to arrive at a verdict by suggesting that they will aid Communists if they do not arrive at a verdict is most undesirable. We cannot countenance such a procedure and find the supplementary charge to constitute prejudicial error in this particular. See Green v. United States, 309 F.2d 852 (5 Cir. 1962).

The judgment will be reversed and the case remanded for a new trial.