848 A.2d 620

**Francis L. HAISCHER**

v.

**CSX TRANSPORTATION, INC.**

**No. 57, Sept. Term, 2003.**

Court of Appeals of Maryland.

May 7, 2004.

120

David S. Schnitzer (Bondurant & Appleton, P.C., on brief), Portsmouth, VA, for Petitioner/Cross–Respondent.

Dennis F. O'Brien, P. Matthew Darby, Theresa A. Rosendale, Baltimore, brief of Amicus Curiae Maryland Trial Lawyers Ass'n, for Petitioner/Cross–Respondent.

Douglas F. Murray (Stephen B. Caplis and Emily A. Daneker, Whiteford, Taylor & Preston, L.L.P., on brief), Baltimore, for Respondent/Cross–Petitioner.

Patrick Kavanaugh, Hamilton and Hamilton, Washington, DC, brief of Amicus Curiae The Ass'n of American Railroads for Respondent/Cross–Petitioner.

Argued Before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, Judge.

Petitioner, Francis Haischer, sued his former employer, CSX Transportation, Inc., under the Federal Boiler Inspection Act (BIA), 49 U.S.C. §§ 20701–03, for injuries he sustained while working as a locomotive engineer on March 1, 2000. A jury in the Circuit Court for Baltimore City found liability on CSX's part and awarded $203,898 in damages, including $101,949 for lost wages. On CSX's appeal, the Court of Special Appeals affirmed the judgment as to liability but concluded that the Circuit Court had erred in precluding collateral source evidence offered by CSX, and it therefore remanded for a new trial limited to damages. *CSX Transp., Inc. v. Haischer,* 151 Md.App. 147, 824 A.2d 966 (2003).

We granted cross-petitions for *certiorari* to consider whether the Court of Special Appeals erred (1) in concluding that the evidence was sufficient to sustain liability under the BIA, and (2) in holding that the collateral source evidence offered by CSX was admissible. We agree with the intermediate

appellate court with respect to the first issue but shall reverse as to the second.

## BACKGROUND

The accident in question occurred around 11:30 p.m. on March 1, 2000. Haischer and Rudy Carroll, the conductor, had been working, without incident, as a two-man crew on a switching job. When he went on duty just before 4:00, Haischer looked over the locomotive but did not find anything to be in improper condition. Near the end of their shift, Haischer and Carroll were in the locomotive on a side track waiting for permission from the dispatcher to enter the main track.

Inside the cab is a unit known as a Head of Train Device (HTD), which appears to be about the shape and size of a stereo receiver and sits on top of a console located immediately to the left of where the engineer sits. When in use, the device enables the engineer to monitor air pressure throughout the train. The back cover of the device, which is not immediately visible to the engineer when sitting in his seat, faces a small set of steps that lead to the nose area of the cab. The back cover of the HTD is attached to the unit by a piano hinge on the bottom and by two screws at the top.

While waiting for clearance to move, Haischer left his seat and went to a refrigerator in the nose of the engine to get some water for himself and Mr. Carroll. Haischer said that he may have brushed against the cabinet as he left, as there was very little room in the cab at that point. The steps leading to the nose are steep—12 to 14 inches apart—and the area in the nose is constricted. Thus, Haischer said, when returning to the cab, he had to "kind of get your shoulders out first and then sort of take off like a runner from the starting block." Prior to his return, the screws holding the HTD door closed had come loose, and the door was hanging down on its hinge. As Haischer returned to the cab, he drove his shoulder hard into the hanging door, causing him to drop to his knees. Haischer said that it was both dark and noisy in the cab and

that he did not see or hear the HTD door come open. The screws apparently were still in their holes, as Haischer testified that, after the accident, the door was re-closed and the screws tightened in order to keep the door shut. Haischer claimed that he had not previously noticed that the door had come open. Most of that part of Haischer's testimony was corroborated by Mr. Carroll.

As soon as he returned to the yard, Haischer reported the incident to the yardmaster and then immediately filed an accident report in which he claimed that the accident resulted from defective equipment, in that the rear cover of the HTD "was not secured properly." He kept an already-scheduled appointment with his doctor two days later to get a cortisone shot for pre-existing pain in the shoulder, and then, on March 20, saw an orthopaedic surgeon, Dr. Wardell, who had been suggested to him by a friend. Dr. Wardell initially diagnosed his condition as an acute exacerbation of a pre-existing calcium deposit and resulting bursitis; he recommended, and ultimately performed, surgery to correct that condition and determine if anything else was amiss. The surgery revealed a tear in the rotator cuff; the doctor removed the calcium deposit and repaired the tear. Dr. Wardell later opined that the rotator cuff tear was caused by the accident and that, because of the demands of the job, Haischer was permanently disabled from continuing to work as a locomotive engineer. Haischer made casual inquiries into other employment but declined vocational rehabilitation assistance belatedly offered by CSX and has not returned to work since the accident on March 1, 2000.

In June, 2000, Haischer filed suit under both the Federal Employer's Liability Act (FELA), 45 U.S.C. §§ 51–60, and the BIA, alleging, among other things, that (1) the HTD device, and therefore the locomotive, was defective, (2) he had no knowledge of its defective condition, (3) he relied on information from others as to whether the locomotive was free from defective conditions or hazards, and (4) CSX should have known that the locomotive was unsafe due to the defective condition of the HTD device door. Prior to the commencement of *voir dire,* Haischer withdrew his separate FELA

claim and proceeded solely on the BIA count. Liability on that count was the basis for the favorable judgment.

## DISCUSSION

### *Liability Under BIA*

■ Section 20701 of 49 U.S.C. provides, in relevant part, that a railroad carrier may use or allow to be used a locomotive only when the locomotive and its parts and appurtenances "are in proper condition and safe to operate without unnecessary danger of personal injury." That statute, first enacted in 1911, was codified as § 23 of Title 45 of the U.S.Code, dealing with railroads, and was part of a number of boiler inspection and safety appliance laws to which the Federal Employer's Liability Act applied. In 1994, the statute was code-revised and moved to title 49 as part of the Federal code revision effort. *See* P.L. 103–272, 108 Stat. 745, and House Report (Judiciary Committee) No. 103–180, 7/15/93, accompanying H.R. 1758, 4 U.S.C.C.A.N. 818, 916–920 (103rd Cong., 2d. Sess.1994).

■ Standing alone, § 20701 does not purport to confer any rights on persons injured when coming into contact with a locomotive or parts thereof that are not in proper condition and safe to operate. As the Supreme Court made clear in *Urie v. Thompson,* 337 U.S. 163, 188, 69 S.Ct. 1018, 1034, 93 L.Ed. 1282, 1302 (1949) with respect to the predecessor statute (title 45, § 23), however, "it has been held consistently that the Boiler Inspection Act supplements the Federal Employers' Liability Act by imposing on interstate railroads 'an absolute and continuing duty' to provide safe equipment." That conclusion, it stated, "stems, not from any express statutory language, but by implication from §§ 3–4 of the Federal Employers' Liability Act, 45 U.S.C. §§ 53–54 . . . which bar pleadings of, respectively, contributory negligence and assumption of risk 'in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.'"

The Court explained that, although it is § 1 of FELA (45 U.S.C. § 51) that creates the basis of an employee's suit for violation of the BIA and that section refers to defects due to the railroad's "negligence," it was the Congressional intent "to treat a violation of the Safety Appliance Act as 'negligence'— what is sometimes called negligence *per se.*" *Id.* at 189, 69 S.Ct. at 1034, 93 L.Ed. at 1303, (quoting from *San Antonio & A.P.R. Co. v. Wagner,* 241 U.S. 476, 484, 36 S.Ct. 626, 630, 60 L.Ed. 1110, 1117 (1916)). Thus, the Court concluded that the BIA is substantively an amendment to the FELA and "dispense[s], for the purposes of employees' suits, with the necessity of proving that violations of the safety statutes constitute negligence; and making proof of such violations is effective to show negligence as a matter of law." *Urie v. Thompson, supra,* at 189, 69 S.Ct. at 1034, 93 L.Ed. at 1303. *See also Lilly v. Grand Trunk W. R.R. Co.,* 317 U.S. 481, 485, 63 S.Ct. 347, 351, 87 L.Ed. 411, 415 (1943): ("Negligence is not the basis for liability under the [Boiler Inspection] Act.").

CSX contends that Haischer failed to present any evidence that the HTD device was not in "proper condition" or was not "safe to operate without unnecessary danger of personal injury"—that it was defective in any way. The railroad suggests three possible reasons for the door coming loose—that Haischer brushed against it, causing it to fall open; that it came open due to continuous vibration from operation of the engine; or that maintenance personnel failed to tighten the screws adequately—and it maintains that none of those reasons creates liability under BIA. The first two possible reasons, it claims, do not show any defect in the device, which is a necessary element for liability; the third, it argues, constitutes not a defect in the device but negligence on the part of other employees, which may be the basis for liability under FELA but not under BIA. In that regard, it uses the sword of strict liability as a shield: if negligence is not the basis for liability under BIA, the railroad cannot be liable for an injury caused by its negligence.

The railroad's position is supported neither by case law interpreting BIA nor by logic. The simple answer is that it

really does not matter which of the three suggested reasons actually caused the door to come loose. As was shown from the incident itself, it was at least a jury question of whether, when the door came loose and was left hanging, the device, and, consequently, the locomotive, ceased to be in "proper condition" and, in fact, became unsafe to operate. It was the railroad's duty under § 20701 to make certain that the screws were sufficiently tightened so that they would *not* come loose, whether by someone brushing against the door or because of normal vibration from the engine. Even though traditional negligence need not be shown under BIA, both of those prospects were entirely foreseeable, and, to satisfy its statutory duty to provide safe equipment in proper condition, the railroad was obliged to assure, through appropriate maintenance, that the screws would remain securely in place. The failure to do so constitutes the kind of "negligence per se" that the *Urie* Court held was imposed by BIA. *Compare Zachritz v. St. Louis–San Francisco Ry. Co.*, 336 Mo. 801, 81 S.W.2d 608 (1935) (plaintiff injured when he fell while attempting to board locomotive by grabbing handrail; no defect shown in handrail); *Ford v. New York, N.H. & H.R. Co.*, 54 F.2d 342 (2nd Cir.1931) (same); *Harlan v. Wabash Ry. Co.*, 335 Mo. 414, 73 S.W.2d 749 (1934) (plaintiff injured when trapdoor was negligently left open; no defect in trapdoor).

*Lilly v. Grand Trunk W. R.R. Co., supra*, 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411, illustrates the point. A brakeman, standing on top of a locomotive tender, was attempting to pull a water spout over the tender when he slipped on ice that had formed on the top of the tender. He claimed that the ice had formed because of a small leak at the collar of a manhole on the tender, from which water flowed onto the surface of the tender. The jury, in a special verdict, found that there was no such leak, which raised the question of whether the general verdict for the brakeman could stand.

The Supreme Court held that, under BIA, the verdict could stand—that BIA imposed an absolute and continuing duty to maintain the locomotive and its appurtenances in safe condition, without unnecessary peril to life or limb and that "[t]he

use of a tender, upon whose top an employee must go in the course of his duties, which is covered with ice seems to us to involve 'unnecessary peril to life or limb'—enough so as to permit a jury to find that the Boiler Inspection Act has been violated." 317 U.S. at 486, 63 S.Ct. at 351, 87 L.Ed. at 415. That conclusion was founded on the Court's rejection of the notion that the BIA covers "only defects in construction or mechanical operation" and its view that "[c]onditions other than mechanical imperfections can plainly render equipment unsafe to operate without unnecessary peril to life or limb." *Id.* at 487–88, 63 S.Ct. at 352, 87 L.Ed. at 416. *See also Topping v. CSX Transp., Inc.*, 1 F.3d 260 (4th Cir.1993) (relying on *Lilly* in upholding liability under BIA for injuries suffered when locomotive engineer slipped on metal object, holding that it was a jury question whether presence of loose object in cab of engine rendered locomotive unsafe to operate).

### Collateral Source Evidence

The railroad's position, throughout trial, was that the incident was, at worst, a minor one which could not have produced the disabling injuries Haischer was claiming and that he was essentially a malingerer. Because of his claimed disability, Haischer was receiving at least $2,320/month from the Railroad Retirement Board, and CSX wanted that fact communicated to the jury. Prior to trial, Haischer moved *in limine* to preclude CSX from offering evidence of his receipt of those disability benefits, citing *Eichel v. New York Cent. R.R. Co.*, 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963) for the proposition that such collateral source evidence was inadmissible. CSX responded that there were exceptions to that rule, that the court had some discretion to admit such evidence, at least where the plaintiff claimed to be impoverished by reason of his inability to work, and that CSX would alert the court in advance if it intended to offer that kind of evidence. Both sides seemed to agree that it was not necessary to decide the issue at that time, so long as CSX did not produce the evidence prior to a court ruling.

The issue arose again at the end of Haischer's case, when, based on certain statements made by plaintiff's counsel in his opening statement and evidence produced by Haischer that CSX regarded as suggesting either financial strain or possible malingering on Haischer's part, CSX sought permission from the court to call Haischer, as a defense witness, to testify regarding the retirement benefits he was receiving. CSX argued that collateral source evidence was admissible to show malingering and to rebut a claim of financial hardship.

CSX alluded first to the comment in plaintiff's counsel's opening statement that "this is [Haischer's] only day or few days in court and so I would ask you to remember that, and whatever the outcome is, this is it for him. If his situation changes five years, ten years down the road, he's not coming back." That statement, CSX argued, was an indication of financial hardship. The railroad called attention next to three aspects of Haischer's testimony. Early in direct examination, Haischer recounted some of the fringe benefits he had received as part of his employment compensation package, including health insurance. Later, he was asked whether he was continuing to receive those fringe benefits, and he responded that the insurance would continue for another two years for himself and one year for his 15–year–old son who lived with him, and that thereafter he would have to pick up that insurance himself. He estimated the cost at about $6,000/year.

The second segment of Haischer's testimony noted by CSX came when he was asked how long he had planned to continue working for the railroad, and he responded:

"Well, depending on how the economy went, and my 401K, I was putting the maximum into it, but the way things were stacking up, it looked like I was going to have to go until I was 65. Figuring my son would go to college, I would have to do that and I wanted some money set aside for my own retirement. So I was pretty much figuring on 65."

CSX then alluded to testimony that Haischer had given some consideration to returning to school and quoted him as

saying "how could I go back to school to better myself in that fashion and pay for the tuition and pay for the books and all the accouterments that I would need to go back to school when there's no money coming in?" Upon our review of the record, we are unable to find any such statement in Haischer's testimony.

CSX treated those statements not only as an indication of financial distress and malingering but also as misleading, as suggesting that Haischer had no income. Relying on *Eichel*, the trial court denied the request. It did not interpret counsel's opening remark as a suggestion that a verdict in this case would be Haischer's only source of income and did not regard the testimony noted by CSX as a sufficiently strong indication of either financial distress or malingering to overcome the prejudice that would accrue from admitting the collateral source evidence.

On appeal, CSX expanded the basis of its argument in favor of allowing the collateral source evidence. It complained not only about counsel's opening statement and Haischer's testimony regarding his eventual need to replace the health insurance but also about a statement made in closing argument (to which no objection was made), certain snippets of testimony by two experts called by Haischer, and Haischer's testimony that he was no longer able to do certain maintenance around his house, that he had to pay someone to do it for him, and that, because of his inability to do the maintenance work, he had considered selling the house.

The statement in closing argument, similar to that made in the opening statement, was to the effect that Haischer could not come back into court later if his situation worsened—that "[t]his is it for him today." Citing *Weinell v. McKeesport Connecting R.R. Co.*, 411 F.2d 510 (3rd Cir.1969) and *Kodack v. Long Island R.R. Co.*, 342 F.2d 244 (2nd Cir.1965), the railroad argued that those statements were improper. The appellate court treated that complaint as going to the propriety of the statements themselves, not as a basis for allowing collateral source evidence and, especially in the absence of any

objection to the argument, concluded that those statements did not, of themselves, warrant reversal.

The Court of Special Appeals found merit in the overall collateral source argument, however. Focusing on (1) Haischer's testimony that, in his disabled condition, he would be unable to earn a wage comparable to that he earned as a railroad engineer, that it would cost him $6,000 to replace the railroad's health insurance, that he had intended to work until 65 in order to be able to send his son to college and to accumulate additional savings for his retirement, and that he was unable to maintain his home without employing others to provide routine maintenance services, (2) a statement from Haischer's vocational rehabilitation expert, Herman Bates, that Haischer had discussed with him "the possibility of selling his home because he couldn't take care of the maintenance," and (3) a statement from Haischer's expert economist, Raymond Strangways, regarding a projected decrease in Haischer's future earnings and loss of fringe benefits, the court concluded Haischer had "opened the door for the introduction of evidence regarding the annuity payments Haischer is receiving."

On the basis of that testimony, the appellate court found *Eichel* and the Fourth Circuit Court of Appeals decision in *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834 (4th Cir.1987) distinguishable, "because in neither of those cases did the employer's attempt to offer evidence of Railroad Retirement benefits follow from the plaintiff's evidence of inferior or damaged financial security." *CSX Transp., Inc., supra*, 151 Md.App. at 165, 824 A.2d at 976. Relying on its earlier decision in *Kelch v. Mass Transit Admin.*, 42 Md.App. 291, 400 A.2d 440 (1979), the court also concluded that there was sufficient evidence of malingering "to open the door to the introduction of evidence of Haischer's Railroad Retirement annuity." *CSX Transp., Inc., supra.* at 166, 824 A.2d at 977. Upon those conclusions, the court vacated the money judgment and remanded for a new trial, limited to the issue of damages.

 The collateral source rule permits an injured person to recover the full amount of his or her provable damages, "regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor." *Motor Vehicle Admin. v. Seidel,* 326 Md. 237, 253, 604 A.2d 473, 481 (1992). The doctrine is widely accepted (*see* Restatement 2d of Torts, § 920A(2) (1977) and comment b. thereto) and rests on public policy considerations—principally that the wrongdoer should not receive a windfall because the plaintiff received a benefit from an independent source, but also that, to the extent the collateral benefit arises from insurance maintained by the plaintiff, the rule encourages the maintenance of insurance. *See Motor Vehicle Admin. v. Seidel, supra,* 326 Md. at 254, 604 A.2d at 481–82, quoting from Restatement 2d, § 920A, comment b; *also Green v. Denver & Rio Grande W. R.R. Co.,* 59 F.3d 1029, 1032 (10th Cir.1995).

The basic law regarding the admissibility, in an FELA or BIA case, of evidence that the plaintiff is receiving Railroad Retirement benefits was set by the Supreme Court in *Eichel v. New York Cent. R.R. Co., supra,* 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307. The plaintiff sued his railroad employer under FELA, claiming that, as a result of the employer's negligence, he suffered a permanently disabling injury. The railroad offered evidence that the plaintiff was receiving Railroad Retirement benefits to impeach his testimony as to both his reason for not returning to work and the permanence of his injuries. The trial court excluded the evidence, but the Second Circuit Court of Appeals reversed and, as did the Court of Special Appeals in this case, remanded for a new trial as to injury and damages.

In a *per curiam* opinion, the Supreme Court reversed the Second Circuit decision. The railroad did not dispute that the evidence could not be considered in mitigation of damages, but asserted that it was admissible as bearing on the extent and duration of the claimed disability; *i.e.,* to show malingering on the plaintiff's part. The Court noted that Railroad Retirement benefits are the equivalent of Social Security benefits for

common carrier employees, that, because they are not attributable to contributions by the employer, they cannot be used to mitigate damages. It then concluded that the likelihood of the jury misusing evidence of those benefits for that impermissible purpose clearly outweighed any probative value of the evidence to show malingering. It posited, in that regard, that "[i]nsofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension." *Eichel,* 375 U.S. at 255, 84 S.Ct. at 317, 11 L.Ed.2d at 309. The Court added that the substantial probative value of the evidence "cannot reasonably be said to be outweighed by the risk that it will create substantial danger of undue prejudice through being considered by the jury for the incompetent purpose of a set-off against lost earnings." *Id.*

Two aspects of the *Eichel* decision are important. First, though using a balancing approach, the Court did not view the admissibility of this kind of evidence as discretionary on the part of the trial court, as Justice Harlan did in a concurring and dissenting opinion and as would be the case if the issue were controlled by Fed.R.Evid. 403 or its common law antecedent, but ruled as a matter of substantive law that the danger of misuse outweighed any probative value of the evidence, at least as to malingering. Most courts seem to have viewed the ruling in *Eichel* that way and have not applied, or even purported to apply, a discretionary balancing approach. *See Reed v. Philadelphia, Bethlehem & New England R.R. Co.,* 939 F.2d 128 (3rd Cir.1991); *Stillman v. Norfolk & W. Ry. Co., supra,* 811 F.2d 834; *Page v. St. Louis Southwestern Ry. Co.,* 349 F.2d 820 (5th Cir.1965); *Wilcox v. Clinchfield R.R. Co.,* 747 F.2d 1059 (6th Cir.1984); *Schroeder v. Pennsylvania R.R. Co.,* 397 F.2d 452 (7th Cir.1968); *Sheehy v. S. Pac. Transp. Co.,* 631 F.2d 649 (9th Cir.1980); *Green v. Denver & Rio Grande W. R.R. Co., supra,* 59 F.3d 1029; *Finley v. Nat'l R.R. Passenger Corp.,* 1 F.Supp.2d 440 (E.D.Pa.1998); *Lucht v. C & O Ry. Co.,* 489 F.Supp. 189 (W.D.Mich.1980); *Hileman v. Pittsburgh & Lake Erie R.R.*

*Co.,* 546 Pa. 433, 685 A.2d 994 (1996); *Melton v. Illinois Cent. Gulf R.R. Co.,* 763 S.W.2d 321 (Mo.App.1988). *Compare McGrath v. Consol. Rail Corp.,* 136 F.3d 838 (1st Cir.1998) (holding that *Eichel* did not establish *per se* rule of inadmissibility and that issue is to be determined by applying Fed. R.Evid. 403).

Second, although we have not previously addressed the issue precisely, the *Eichel* view that collateral source evidence is substantively inadmissible is consistent with decisions of this Court regarding such evidence. *See Motor Vehicle Admin. v. Seidel, supra,* 326 Md. at 253, 604 A.2d at 481. ("Since 1899, the collateral source rule has been applied in this State to permit an injured person to recover in tort the full amount of his provable damages regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor.").

Because we have adopted the collateral source rule as part of our own substantive law, whether we view the Supreme Court's ruling in *Eichel* as a matter of substantive Federal law that we are obliged to apply under the Supremacy Clauses in both the Federal and Maryland Constitutions or, as the *McGrath* court did, as a matter of Federal evidence law that we are not obliged to follow is of little consequence. The principle underlying the *Eichel* ruling is entirely consistent with that underlying our adoption of the collateral source rule, and so we hold, as a matter of State law and subject to the discussion below, that evidence of a plaintiff's receipt of Railroad Retirement benefits is ordinarily inadmissible to show possible malingering on the part of the plaintiff. As the *Eichel* Court noted, there is, on the one hand, too much danger that the jury might use such evidence for the impermissible purpose of mitigating damages, and, on the other, alternative ways of showing malingering that do not carry that danger. To the extent that the Court of Special Appeals found the collateral source evidence admissible to show malingering on Haischer's part, it erred.

Notwithstanding the language used in *Eichel*, most courts faced with the issue have concluded that there are certain limited exceptions to the inadmissibility of collateral source evidence in FELA and BIA cases. The one at issue here is that, if the plaintiff claims, in argument or through the introduction of evidence, that he/she is in financial distress due to the injury arising from the railroad's negligence or violation of BIA and has no other sufficient source of income, evidence that the plaintiff is receiving Railroad Retirement benefits is admissible to rebut that claim. *See Santa Maria v. Metro–N. Commuter R.R.*, 81 F.3d 265, 273 (2nd Cir.1996); *Gladden v. P. Henderson & Co.*, 385 F.2d 480 (3rd Cir.1967, *cert. denied*, 390 U.S. 1013, 88 S.Ct. 1262, 20 L.Ed.2d 162 (1968)); *Moses v. Union Pac. R.R.*, 64 F.3d 413, 416 (8th Cir.1995), *rehearing denied*, 64 F.3d 413 (8th Cir.1995); *Moore v. Missouri Pac. R.R. Co.* 825 S.W.2d 839, 842–43 (Mo.1992) (en banc). That evidence, the courts have held, may be used "for the narrow purpose of testing the credibility of plaintiff's assertion regarding financial distress." *Leake v. Burlington N. R.R. Co.*, 892 S.W.2d 359, 363 (Mo.App.1995); also *Lange v. Missouri Pac. R.R. Co.*, 703 F.2d 322, 324 (8th Cir.1983).

We agree that use of such evidence for that limited purpose is proper. The question then becomes whether Haischer, through the argument and evidence noted, opened the door to the admission of that evidence—whether he, in fact, asserted a level of poverty that was misleading.

The Court of Special Appeals found telling the testimony by Haischer and two of his experts that, due to his injury, Haischer would be unable to earn a wage comparable to that earned as a railroad engineer, that he would, within a year or two, incur a cost of $6,000 to replace the health insurance supplied by CSX, that he had planned to work until 65 in order to be able to afford to send his son to college, and that he would be unable to maintain his home without employing others to do the kind of maintenance and repairs that he used to do. CSX, as noted, complains as well about Haischer's opening statement. We do not believe that any of that

testimony, or the opening statement, together or separately, justified the admission of the collateral source evidence.

 The rationale for the exception is that, without it, the plaintiff may be able to paint a truly misleading picture for the jury of the extent of his/her loss and thus obtain a recovery in excess of what is warranted. *See Gladden v. P. Henderson Co., supra,* 385 F.2d 480, 483–84. That rationale necessarily governs the scope of the exception. We reject CSX's argument, now relegated to a footnote in its brief, that counsel's remark in opening statement that Haischer's "day in court" was "it for him" and that he could not return for more if his situation changed in the future, served to put Haischer's financial condition at issue. Apart from the lack of any objection, that remark was not only correct but in no way implied that a recovery in this case would be Haischer's only source of income. Reading the remark in its entirety, all counsel said was that this was Haischer's one opportunity for a recovery in this case. He in no way implied that Haischer had no other source of income or that he would be destitute without a proper verdict. *Compare Weinell v. McKeesport Connecting R.R. Co., supra,* 411 F.2d at 512 (holding improper a statement by counsel that FELA provided "the only method" by which an injured railroad worker may "be paid for an on-the-job injury while he was at work for the Railroad"). CSX's reliance on that case is misplaced: apart from the more egregious nature of the remark, the court reversed the plaintiff's judgment on other grounds and did *not* hold that collateral source evidence was admissible because of that statement. The same holds true for the other two cases cited by CSX— *Kodack v. Long Island R.R. Co., supra,* 342 F.2d at 247 (statement that FELA plaintiff had "no compensation rights" improper but harmless, no issue being raised about admission of collateral source evidence) and *Stillman v. Norfolk & W. Ry. Co., supra,* 811 F.2d 834 (error to inform jury that FELA was plaintiff's "only possible remedy").

 CSX also misreads the nature of the testimony underlying its argument. None of the testimony referred to sug-

gested that Haischer was impecunious or had no other source of income. It apparently was a fact—as it was not disputed—that Haischer was facing the loss of health insurance that he had received as a fringe benefit and that it would cost $6,000 to replace that insurance. Haischer did not say, or imply, that he could not afford to replace the insurance, but only that he would have to do so. In testifying regarding his previous intention of continuing to work until he was 65, in order to put additional money aside in his 401k plan and pay for his son's college education, Haischer did not say that, in his present circumstances, he would not be able to afford to send his son to college. Evidence as to his expected work-life is not only relevant, but necessary, to establish the amount of his wage loss. If that kind of evidence suffices to trigger collateral source evidence, there would be nothing left of the collateral source rule. *See Leake v. Burlington N. R.R. Co., supra,* 892 S.W.2d 359, 363 (court erred in admitting collateral source evidence based on plaintiff's testimony that he would have had to work 14 more years to retire).

■ The testimony regarding maintenance and repairs at his home dealt with Haischer's physical inability to do that kind of work "because it prompted pain," which required him to employ people for that purpose and led him to consider selling the house. Neither he nor his experts suggested that he could not afford to have the maintenance done. Indeed, he stated that he *did* employ persons to do that work, indicating that he *could* afford to do so.

Most of the cases in which collateral source evidence was allowed to rebut indications of impecuniousness involved far more specific and direct evidence of impoverishment and are therefore distinguishable. *See,* for example, *Lange v. Missouri Pac. R.R. Co., supra,* 703 F.2d at 324 (collateral source evidence admissible to test credibility of plaintiff's testimony that he had to return to work immediately after surgery because he had no disability income); *Gladden v. P. Henderson & Co., supra,* 385 F.2d 480 (collateral source evidence admissible to rebut testimony that plaintiff did not

return to doctor because his "bills got behind" and that he returned to work to catch up on his bills and support his family); *Moore v. Missouri Pac. R.R. Co., supra,* 825 S.W.2d at 842–43 (collateral source evidence admissible to rebut testimony that plaintiff could not continue with physical therapy because he could not afford it). *Compare Illinois Cent. Gulf R.R. Co. v. Haynes,* 592 So.2d 536, 541–42 (Ala.1991) (collateral source evidence not admissible to rebut testimony that plaintiff could not afford to go to trade school).

On this record, the trial court did not err in excluding the collateral source evidence offered by CSX. We shall therefore reverse the judgment of the Court of Special Appeals.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT FOR BALTIMORE CITY; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT/CROSS-PETITIONER.