941 A.2d 547

**TITAN CUSTOM CABINET, INC. et al.**

v.

**ADVANCE CONTRACTING, INC. et al.**

**No. 1957, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Feb. 7, 2008.

Richard I. Chaifetz, Columbia, for appellant.

Mark T. Foley (William N. Zifchak, Sasscer, Clagett & Bucher, on brief), Upper Marlboro, for appellee.

Panel DAVIS, SALMON, and ROBERT L. KARWACKI (retired, specially assigned), JJ.

DAVIS, J.

Appellants, Titan Custom Cabinet and Johansson Corporation, appeal from the denial of a Motion for New Trial entered by the Circuit Court for Baltimore City (Ross, J.) on September 23, 2006. This appeal arises out of a tort claim, in which appellants allege that appellees, Advance Contracting, Inc. and Timothy Nickels, negligently repaired the roof of appellants' premises, thereby clogging a roof drain that ultimately resulted in a flood of their premises.

On March 18, 2005, appellants filed suit against appellees in the Circuit Court for Baltimore City; appellees answered the Complaint on May 6, 2005. Appellees then filed a Third Party Complaint on August 9, 2005 against Crown Industrial Park (Crown), the owner of the property where appellants' premises are located. Crown, however, was never served with the Third Party Complaint. On September 21, 2005, the Third Party Complaint was amended to add Wayne Kirchner, the property manager of Crown, as a defendant/third-party plaintiff. The Amended Third Party Complaint alleged that Kirchner's negligence caused or contributed to the flood and, thus, he should be liable for any damages awarded to appellants. Kirchner filed his Answer on December 19, 2005.

Prior to the commencement of trial, appellants and appellees agreed to a jury trial on the issue of liability only. On August 30, 2006, a three-day trial began. At the conclusion of the third day, the jury returned a judgment in favor of appellees. Thereafter, appellants filed a timely Motion for New Trial and for Judgment Notwithstanding the Verdict. The Motion was denied on September 23, 2006. This timely appeal followed, presenting for this Court three questions, which we have rephrased as follows: [1]

---

1. The issues on appeal, as framed by appellants, are:

  1. Whether the Circuit Court for Baltimore City erred when it permitted appellees to introduce documents and cross-examine appellants' witnesses about appellants' property insurance and their relationship with their property insurance carrier?

1. Did the trial court err in permitting cross-examination of appellants' witnesses with prior inconsistent statements made to their property insurance carrier and regarding their relationship with their property insurance carrier?

2. Did the trial court err in admitting certified copies of weather reports from Baltimore–Washington International Airport to show rain accumulations?

3. Did the trial court err in denying appellants' Motion for New Trial?

We answer the questions presented in the negative and, accordingly, affirm the judgment of the trial judge.

## FACTUAL BACKGROUND

Since 1997, appellants have occupied a commercial leasehold space at 56N of the Crown Industrial Park located on Eastern Avenue in Baltimore, Maryland. Crown is the owner and landlord of this property located within the Crown Industrial Park.

The building at 56N has an "A" frame roof, in which the center line of the roof runs parallel to the front of the building. There are other buildings in the industrial park which adjoin appellants' premises on both sides and in the back. Consequently, when water falls on the back part of the roof, the water flows downward, until it accumulates at the bottom of the roof. As a result, two drains were installed in the low area of the back portion of the roof to allow any accumulated water to drain.

During the winter of 2001 to 2002, appellants' premises, located below the low point on the back of the roof, began to leak. For the thirty years preceding this leak, Crown had not

2. Whether the Circuit Court for Baltimore City erred when it allowed the admission of official weather records from Baltimore–Washington International Airport without explanation by an expert witness?

3. Whether the Circuit Court for Baltimore City erred when it denied appellants' Motion for a New Trial?

experienced any roofing problems. After being notified of the leak, Kirchner told Anders Johansson, the president and principal of both appellants, that permanent repair work would need to be completed during the spring. In the meantime, a temporary system of troughs was put into place to catch the leaking water.

By mid-April of 2002, Crown had contracted with appellees to repair the roof. Thereafter, appellees installed an asphalt roof on the 56N building including the area near the drains. George Harris, one of appellees' employees, supervised the job and performed much of the work. He testified that the drains on the roof were protected during the repair work with the use of "microsopic/KWRAPD," a roofing industry product, commonly referred to as a "mop head or yard." These protective products were placed over the drains to prevent clogging. One of the drains, however, was clogged prior to appellees beginning work. Appellees notified Crown of this clogged drain and were told by Crown that it would take care of the problem. On April 15, 2002, appellees completed the job without incident.

On May 2, 2002, after a heavy rainfall, Preston Fulk, one of appellants' employees, reported water leaking along the back wall of the premises that had formed into a pool of water approximately eight inches deep. The employee began moving equipment and materials away from the water and called Johansson to inform him of the leak. Johansson instructed the employee to contact Kirchner. Kirchner went onto the roof of the building to inspect the leak. Near the back wall of the roof, Kirchner found water that was in areas eighteen inches deep. He also noticed that one of the drains was clogged and subsequently removed approximately two handfuls of debris, including one or two bottles from the drain. When the drain still would not allow water to flow, Kirchner used a piece of wooden molding in an attempt to free the drain. Shortly thereafter, the drain gave way and thousands of gallons of water poured into appellants' premises.

Kirchner helped remove the water from appellants' premises. Afterward, he testified that he found a broken piece of pipe filled with gravel and a mixture of old and new tar. The following day, Johansson conducted his own investigation of the water damage. Johansson testified that, during his investigation, he observed an elbow joint pipe filled with a mixture of old and new tar lying on the floor below the roof drain in the ceiling. All testimony at trial indicated that the distinction between old and new tar is its color—old tar is gray and oxidized, while new tar is dark black on the outside.

During Johansson's investigation, he took thirty to forty photographs of the scene of the damage and made important notes. Johansson, however, did not take a photograph of the elbow pipe. The elbow pipe and the notes regarding the elbow pipe were subsequently discarded during clean-up.

Three days after the flood, Johansson composed a letter to appellants' insurer, The Hartford Fire Insurance Company (Hartford), regarding the loss and, in relevant part, wrote:

In discussing this claim with ... (our agent) he noted that it is not up for subrogation.

You know as well as I know that the landlord's appointed manager (Wayne) [Kirchner] poked the hole in the pipe that caused the damage.

I like that you subrogate this claim, since it will otherwise stay on my "insurability profile."

A provision in the lease between Crown and appellants, however, barred a direct claim against Crown.

During the year following the flood, appellants made a claim under the property damage portion of their Commercial & Comprehensive General Liability (CGL) policy with Hartford. The insurance company paid most of the claim, but failed to pay all of appellants' business interruption claim. Appellants subsequently sued Hartford in Baltimore City Circuit Court for the balance of their business interruption loss. Hartford moved the case to federal district court where it claimed that a "Proof of Loss," which appellants had executed, was an accord and satisfaction of the claim. The federal district court

agreed and appellants appealed. The appeal was ultimately settled for a nominal amount and Hartford released its subrogation claim as part of the settlement agreement.

Almost three years after the flood, in 2005, appellants brought suit in Baltimore City Circuit Court against appellees. Before trial commenced, the court granted appellants' Motion to Bifurcate so that no issues would be presented to the jury regarding damages. During the three-day jury trial, appellees, over the objection of appellants, introduced into evidence the letter from Johansson to Hartford. Appellees, also over the objection of appellants, cross-examined appellants' witnesses regarding that correspondence and the lack of success appellants had achieved in pursuing claims against Crown and Hartford. In addition, appellants objected to the weather data records compiled by the U.S. Department of Commerce Weather Station at the Baltimore–Washington International Airport that were introduced into evidence without an explanation of an expert witness.

On September 1, 2006, the jury returned a verdict for the defendants. Appellants subsequently filed a Motion for New Trial and for Judgment Notwithstanding the Verdict, which was later denied.

## DISCUSSION

### I

Appellants initially contend that the circuit court erred in allowing appellees to introduce Johansson's note to Hartford into evidence. Appellants further aver that the court improperly permitted cross-examination of their witnesses regarding their relationship and insurance coverage with Hartford, thereby violating the collateral source rule. Appellees, in rejoinder, argue that appellants' witness, Johansson, was properly questioned regarding his prior inconsistent statement contained in the note to Hartford. Appellees also insist that the factual chronology elicited through the cross-examination of appellants' witnesses regarding appellants' unsuccessful recovery against Hartford explained appellants' new motiva-

tion to pursue a claim against appellees almost three years after the flood. Upon our review of the proceedings below, we hold that the trial court did not abuse its discretion in permitting appellants' witness to be impeached by prior inconsistent statements and we conclude that there was no violation of the collateral source rule.

## STANDARD OF REVIEW

"Generally, the standard of review with respect to a trial court's ruling on the admissibility of evidence is that such matters are left to the sound discretion of the trial court and unless there is a showing that the trial court abused its discretion, 'its [ruling] will not be disturbed on appeal.'" *Hall v. Univ. of Maryland Med. Sys. Corp.*, 398 Md. 67, 82, 919 A.2d 1177 (2007) (quoting *Bern–Shaw Ltd. P'ship v. Mayor and City Council of Baltimore*, 377 Md. 277, 291, 833 A.2d 502 (2003)) (brackets in original). The application of that standard depends on "whether the trial judge's ruling under review was based on a discretionary weighing of relevance in relation to other factors or on a pure conclusion of law." *Bern–Shaw*, 377 Md. at 291, 833 A.2d 502. If the trial judge's ruling involves a pure legal question, we will review the trial court's ruling *de novo. Id.; see also Bernadyn v. State*, 390 Md. 1, 8, 887 A.2d 602 (2005) (concluding that, in a criminal case, the trial court's decision to admit or exclude hearsay is not discretionary and is thus reviewed *de novo* ). Given that the trial judge's ruling under our review was based on a discretionary weighing of relevance in relation to other factors, we shall review the legal questions presented at bar using the abuse of discretion standard of review. Moreover, as we reiterated in *Lomax v. Comptroller of the Treasury*, 88 Md.App. 50, 54, 591 A.2d 1311 (1991), we will only reverse upon a finding that a trial judge's determination was "both manifestly wrong and substantially injurious."

## PRIOR INCONSISTENT STATEMENT

Prior to addressing Johansson's correspondence with Hartford before the jury, appellees' counsel approached the bench

and advised the court of his intention to cross-examine Johansson regarding his prior inconsistent statement made to Hartford, in which he blamed Crown for appellants' loss and requested legal pursuit of Crown to preserve appellants' insurance status. Appellees' counsel also proffered that he planned to cross-examine Johansson about the fact that there was a three-year delay in any assertion of negligence against appellees; these claims were pursued only after appellants' claims against Crown and Harford were unfavorably resolved. Appellants objected to the proposed line of cross-examination, protesting that it was "totally improper for a party to bring issues of insurance in a case like this." The trial judge, however, ruled that this was not an instance where appellees were insinuating that appellants had already been "fully paid."

The court, after reviewing the Johansson correspondence and listening to the arguments of counsel, found that "the critical issue of the case" was whether Johansson did in fact observe an elbow joint pipe clogged with fresh tar lying on the ground the day following the flood. Consequently, the court permitted the cross-examination of Johansson regarding his inconsistent statements and the fact that appellants waited three years before initiating suit against appellees. The court, *sua sponte*, treated appellants' objections to appellees' proposed line of questioning as a Motion *in Limine* by appellants and denied it. Johansson was then cross-examined and the testimony in dispute has been reproduced in pertinent part below:

[Appellees' counsel]: Q. You had insurance on your property in the building, correct?

[Appellants' counsel]: Objection.

THE COURT: Overruled.

[Appellees' counsel]: You had insurance on it?

A. Yes.

Q. And one concern you had—you were familiar with something called an insurability profile?

A. Yes.

Q. The fact is: If you had too many claims, you may lose your insurance; the rates may go up; you may not be able to get insurance, correct?

A. That could be one description, yes.

Q. You also knew—

[Appellants' counsel]: Can I have a continuing objection on this line of questioning?

THE COURT: You may.

[Appellants' counsel]: Thank you.

[Appellees' counsel]: You also knew that if you had a claim and are able to have it be somebody else's fault, someone that the insurance company could get the money back from, that would not go on your insurability profile, correct?

A. I wasn't sure of that.

Q. Let me show you what has been marked as Defense Exhibit 17. Tell me if you can identify it. (Whereupon there was a pause in the proceedings.)

A. Yes.

Q. What is it?

A. It's a letter to an insurance company.

Q. Who wrote it?

A. Me.

Q. That he [sic] was the date on it?

A. May the 6th.

Q. Would you please read it to the jury?

A. "Suit. In discussing this claim with Mr. Heartly [sic], our agent, he noted that it is not up for subrogation."

Q. Let me ask you, subrogation you knew is a principal [sic] by which the insurance company goes after the person that caused the claim, right?

A. Yes.

Q. In your deposition you said it's making the guilty party pay, correct? Is that correct?

A. I wouldn't say guilty. Responsible party.

Q. Please continue. I won't interrupt again.

A. "You knew as well as I know that the landlord appointed the manager to put the hole in the point that caused the break. I like that you subrogated this claim since it would otherwise stay on my insurability profile."

Q. So it is true that as of May 6th, 2002—at least based upon that letter—the person that you considered responsible for the flood was Mr. Kirchner?

A. Yes. From what I knew at the time.

Q. And you copied—you were already represented by Mr. Chaifetz [appellee's counsel] at the time, were you not?

A. Mr. Chaifetz is my lawyer for many years.

Q. You copied him on that letter?

A. Yes.

[Appellees' counsel]: Your Honor, I introduce Exhibit 17.

[Kirchner's counsel]: Objection

THE COURT: Overruled.

[Appellees' counsel]: Now, you subsequently did make a claim against your insurance company for damages; is that correct?

[Appellants' counsel]: Objection.

THE COURT: Overruled.

THE WITNESS: Yes.

[Appellees' counsel]: Incidentally, you found out at some point that under your lease agreement, you couldn't sue your landlord?

A. No.

Q. Correct?

A. No.

Q. And your lease says you can't do it. The landlord is not responsible?

A. I knew that all the time.

Q. You knew that? So you made the claim against your insurance company, but that didn't end satisfactorily. There was a dispute as to what the proper payment should

be and you felt felt [sic]. It hadn't been handled correctly, so you sued the insurance company?

A. Correct.

Q. And ultimately, you lost that case, correct?

A. No, we settled the case.

Q. Well, you settled it for this much, correct—compared to what you were looking for?

A. It was the best deal we could make under the circumstances.

Q. On a percentage basis, without getting into numbers, what percentage of what you were looking for did you settle for?

A. How can I answer you that without giving a number?

Q. You don't. Just give a percentage.

A. I can't give a percentage because that's a number.

Q. One service of a hundred dollars is just one percent of the number, but whether it is a thousand dollars, $10,000 or $1, one percent is one percent. We don't have to give the numbers because of a certain ruling by the Court. But what is the percentage?

A. I don't know.

Q. Isn't it a fact it is a very, very small percentage, what you settled for in terms of what you were looking for?

A. I don't think so.

[Appellant's counsel]: May I approach?

THE COURT: You may.

(Whereupon the parties approached the bench and the following proceeding ensued on the record).[2]

\* \* \*

Q. That lawsuit concluded the beginning of 2005, correct? That is when it was resolved?

---

2. The colloquy with counsel is not relevant to the issue at bar. The court allowed no further discussion of the amount appellants received from Hartford.

A. It's possible.

Q. And it is after it resolved that you filed your lawsuit against my client, correct?

A. As supervisors [sic], we heard that your client was responsible. We attempted to find him and serve him, but we spent a couple of years trying to find him, but we couldn't.

Q. I see. That's the delay. It took a couple of years to sue my client because you didn't know who had done the roofing work?

A. No. Well, that we knew. But to get hold of him to discuss it with him was impossible.

Q. I see. Assume you sent him some letters? I assume there is some written evidence of the assertion you are just making now?

A. I think we have the private detective that went out to his last given address.

Q. After you filed suit is what you're talking about, sir; isn't that true?

A. No.

Q. Do you have any written documentation or does [appellants' counsel] have any written documentation to back up what you are saying?

A. You'd have to ask [appellants' counsel] that.

■ Appellants argue that the mention of insurance during Johansson's cross-examination contaminated the trial, resulting in a fatal error and they point to the holding of *Morris v. Weddington*, 320 Md. 674, 681, 579 A.2d 762 (1990), to the effect that "[o]ur cases generally prohibit the slightest references in front of the jury primarily because such reference is irrelevant and has no bearing on the issue of damage" to advance its argument.

Maryland Rule 5–411 delineates the general rule regarding admission of evidence of liability insurance to show negligence:

Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person

acted negligently or otherwise wrongfully. This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.

■ It is well-established that evidence of a party's insurance is not permitted to show the ability or inability to pay and is, furthermore, not relevant to the proceeding as it may prejudice the jury's consideration of damages. *See Morris,* 320 Md. 674, 579 A.2d 762. Maryland case law and Md. Rule 5–411, however, have carved exceptions out of the general prohibition against admitting evidence regarding a party's liability insurance. *See Snowhite v. State, Use of Tennant,* 243 Md. 291, 221 A.2d 342 (1966). In *Snowhite,* the Court set forth and examined exceptions to the rule. Two of these exceptions are relevant in the case *sub judice:* "the fact of insurance may be relevant as bearing upon the credibility of a witness" and "an admission of a party bearing on negligence or damages may include a reference to the fact of insurance which cannot be severed without substantially lessening the evidential value of this admission." *Id.* at 301, 221 A.2d 342 (quoting McCormick of Evidence § 168, p. 356). While these two exceptions are applicable, the trial judge did not have to rely on the exceptions because the cross-examination of Johansson did not involve his insurance coverage, but instead only referenced appellants' communication with their own insurance carrier. Thus, we hold that the mention of insurance was to impeach Johansson's prior inconsistent statement.

Appellants further argue that an analysis of the cross-examination shows that appellees' counsel did not impeach Johansson's testimony. Appellants claim that the line of questioning regarding Johansson's initial belief that Kirchner was responsible for the flood was not proper and that, even assuming it was proper, it was not developed. We disagree. The correspondence that was read into evidence directly contradicts Johansson's assertion that he initially believed appellees were at fault after allegedly finding the joint elbow pipe. In the note to Harford, Johansson blames Kirchner, writing:

"You know as well as I know that the landlords [sic] appointed manager [Kirchner] poked the hole in the pipe that caused the damage." Moreover, Johansson not only maintains that Kirchner was responsible for the damage sustained, but even urged his insurance company to pursue Crown for subrogation. We disagree with appellants' assertion that an inquiry into Johansson's initial belief as to who was responsible would only even arguably be proper if appellants had first sued Mr. Kirchner, given that a provision in the lease agreement between Crown and appellees barred this type of suit.

A juror, hearing the contents of the letter and, upon learning that appellants were unable to sue their landlord for the flood damage, may conclude that Johansson did not see any new tar in the elbow joint and had only later, contrary to his direct testimony, formulated the opinion that appellees were at fault after all other avenues of recovery had proven unsuccessful. Given this inference, the court allowed appellees, through cross-examination, to show the chronology of the shift in appellants' focus for recovery.

Appellees impeached the alleged observation of the clogged elbow joint pipe on several grounds throughout trial. They elicited varying descriptions of the elbow joint pipe from appellants' witnesses, one describing the joint as intact and another describing it as shattered in pieces. Furthermore, the only photograph of the elbow joint showed it still connected to the other pipes near the ceiling of the warehouse and not on the ground as Johansson had described. Johansson also testified that, the day after the flood, he found an elbow joint pipe lying on the ground above the drain pipe in the ceiling. He claimed that the elbow joint was filled with old and new tar. Johansson then immediately suspected appellees as the cause of the flood. During his investigation, Johansson contemporaneously photographed the entire scene, but failed to photograph the elbow joint. Because of his suspicion that appellees were the cause of the flood, Johansson documented his observations of the elbow joint pipe in notes. The notes and the elbow joint pipe at issue, however, were subsequently destroyed.

Continuing to impeach appellants' evidence relative to the "critical issue" of the case, appellees remarked that, after immediately concluding appellees were at fault, Johansson wrote a letter to Hartford insisting that Kirchner poked a hole in the drain pipe that caused the water damage. In the letter, Johansson requested that Hartford pursue Crown in subrogation to preserve his company's insurance record. A claim for subrogation against Crown, however, was barred by the lease provision. In the year following the flood, Hartford paid most of appellants' property claim, but failed to pay all of its business interruption claim. Consequently, appellants brought suit against Hartford. After losing at trial, appellants and Hartford settled on appeal for a nominal amount and on the condition that Hartford release its subrogation claim as part of the settlement agreement. Appellees finished its sequential timeline by pointing out that, after the litigation with Hartford ended unsatisfactorily, appellants sued appellees alleging negligence.

The chronological timeline evidences, in our view, why the reference to appellants' insurance carrier was relevant and probative to "the critical issue of the case."

## B

### COLLATERAL SOURCE EVIDENCE

Appellants further submit that the cross-examination ran afoul of the collateral source rule. The collateral source rule "permits an injured person to recover the full amount of his or her provable damages, regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor." *Haischer v. CSX Transp., Inc.* 381 Md. 119, 134, 848 A.2d 620 (2004) (holding that "collateral source evidence is substantively inadmissible is consistent with decisions of this Court regarding such evidence"); *see also* Restatement (Second) of Torts § 920A (1979). Appellees acknowledge that there are circumstances where the insurance status of a plaintiff may raise collateral source concerns, but aver that Johansson's cross-examination

does not raise such a concern. Instead, appellees contend that appellees' counsel properly questioned Johansson about his lack of success in pursuing collateral sources. We agree.

Appellants conclude that "a defendant could not in a tort case, such as this one, introduce evidence of the fact that the plaintiff had received insurance payments from a policy for which he had paid," relying on *Haischer* to support its proposition. In *Haischer*, however, the Court of Appeals analyzed whether the railroad company could introduce post-injury benefits after it claimed that its employee, suing under the Federal Boiler Inspection Act, 49 U.S.C. 20701, made a claim of financial distress and demonstrated malingering. *Id.* at 129, 848 A.2d 620. The Court reviewed potential exceptions to the collateral source doctrine and determined that disproving allegations of financial distress and malingering were not applicable. *Id.* at 135, 848 A.2d 620. Thus, *Haischer* makes clear that collateral source evidence may at times be admissible to attack damages.

Despite the rationale and holding of *Haischer*, the case is not determinative of the issue *sub judice*. Johansson was not cross-examined on the issue of damages, but impeached regarding a prior inconsistent statement. Nowhere in the record does appellees' counsel imply that appellants had already received compensation for their damages and, thus, should not be compensated again. The court instead allowed the line of questioning to suggest that appellants changed their theory for recovery, three years after the flood, only after they were unsuccessful in pursuing their claims against Crown and Hartford.

Appellees attempt to bolster their collateral source argument by asserting that the bifurcated nature of the trial, whereby no issues regarding damages were presented to the jury, undermines any claim of prejudice. Appellants counter that the mention of insurance and the fact that appellants received payment, even if only partial, from Hartford is always harmful because "it paints the plaintiff as a party which is trying to obtain an improper (at least in the jury's eyes)

double recovery." Regardless of whether appellants' damages were at issue, the collateral source rule was not implicated. The purpose of the cross-examination was to impeach Johansson's credibility by pointing out his prior inconsistent statement and not to suggest that appellants were "partially paid." Furthermore, appellants brought suit against appellees only after litigation ended unsatisfactorily with Hartford. This, coupled with the fact that, amid appellants' forty photographs and documented notes that there was no physical evidence to corroborate their witnesses' claims that a joint elbow pipe clogged with new tar existed, rebuts "the critical issue" in the case.

Finally, appellees argue that appellants had the opportunity to request a collateral source instruction, but failed to do so. Appellees claim that the instruction could have been modified to inform the jury that its determination of the liability issues should not be affected by an inference or testimony regarding potential recoveries by appellants from collateral sources. Appellants contend that, because appellees opened "the insurance Pandora's Box," they were only obligated to object to the testimony and not to cure it with a pattern instruction. As stated previously, there was no prejudice to appellants from appellees mention of their insurance carrier. Consequently, the issue of who, if anyone, should have requested a modified pattern instruction regarding the collateral source rule is not determinative of the issue *sub judice*. We, therefore, conclude that the trial court properly exercised its discretion in permitting the impeachment of Johansson through his prior inconsistent statement an d in allowing appellees to question appellants' motivation to pursue litigation three years after the flood.

## II

Appellants, in their second issue, contend that the circuit court erred in allowing the introduction of weather records into evidence without an expert to explain the information contained therein. Appellees counter that weather reports regarding amounts of rainfall were properly admitted.

In their case, appellees offered certified copies of the U.S. Department of Commerce's weather records for the Baltimore–Washington International Airport reporting rain patterns at the airport between the day of the roofing job, April 15, 2002, and the date of the flooding, May 2, 2002. Appellants objected to appellees' proffer of evidence, protesting that the distance between BWI Airport and its premises at 56N was approximately ten miles and, thus, too great a distance for a jury to speculate as to whether it had also rained at appellants' place of business. The court found that appellants' argument went to the weight of the evidence and not its admissibility and admitted the weather records.

■ The court's evidentiary ruling on whether or not to admit the weather records is also governed by the abuse of discretion standard. *Hall v. Univ. of Maryland Med. Sys. Corp.*, 398 Md. 67, 82, 919 A.2d 1177 (2007). The trial judge's determination is given broad latitude and is not disturbed on appeal unless abused. *Ellsworth v. Sherne Lingerie, Inc.*, 60 Md.App. 104, 118, 481 A.2d 250 (1984). The trial court's ruling admitting the weather reports was a proper exercise of its discretion. We explain.

First, the issue in dispute is whether appellees negligently clogged the drain during their installation of the asphalt roof. Appellees offered weather records indicating that the airport received over three and a half inches of rain between April 16 and May 1, including two days, April 18 and April 28, of rain accumulations greater than one inch. Appellees offered the records showing this significant rainfall between April 16 and May 1 as circumstantial evidence that their conduct did not cause the damage in question, but that some other intervening cause was at fault. As such, the records were probative to rebut appellants' claim that appellees negligently repaired the building's roof.

Secondly, upon reviewing the documents, although lengthy, we agree that the records were not complicated or outside of the ordinary layperson's knowledge. In fact, the last column of the chart clearly denotes precipitation totals for the day.

In appellants' brief, they argue that the thirty-page exhibit "contains literally thousands of measurements which were beyond the ability of the lay jurors to understand without the assistance of an expert" and thus, pursuant to Md. Rule 5–702, an expert should have assisted the jury in understanding the meaning of the weather records. There is, however, no authority for appellants' assertion that an expert opinion is needed to interpret or explain the recorded rainfall amounts contained within a weather report.

To support their assertion that expert testimony was needed, appellants cite the unreported decision of the United States District Court for the Northern District of Illinois in *Schultz v. American Airlines, Inc.*, 1989 WL 64725 (N.D.Ill. June 8, 1989). In *Schultz*, the plaintiff sought to introduce evidence of a weather report available to the airline before the aircraft took off showing turbulence in the area. The plaintiff contended that the airline should have known that there was heavy turbulence in the area and that therefore, the aircraft should have remained grounded. The court did not, as appellants suggest, refuse to allow the plaintiff to introduce the weather reports in the absence of expert testimony, but instead found that the weather report of heavy thunderstorms and wind, without an expert to show a standard of care violation by the airline, did not by itself create a *prima facie* case of negligence.

██ We conclude that the trial court did not abuse its discretion in allowing appellees to enter the weather records into evidence. The records were not beyond a layperson's understanding as they merely quantified rainfall at a given location. The fact that the airport was approximately ten miles from appellants' premise does not go to the admissibility of the evidence, but to the weight of the evidence. In sum, the admission of the weather records was appropriate.

### III

In their last argument, appellants assert that the circuit court erred when it denied appellants' Motion for New Trial

by re-arguing the grounds advanced in their first two questions presented for our review. For the reasons we have stated, *supra*, and our discussion in this section, we hold that the circuit court properly denied appellants' motion.

■ Maryland Rule 2–533 provides that a motion for new trial is within the sound discretion of the trial court and its ruling is ordinarily not reviewable on appeal. *Brinand (Brenan) v. Denzik*, 226 Md. 287, 173 A.2d 203 (1961); *Mack v. State*, 300 Md. 583, 600, 479 A.2d 1344 (1984) (An appellate court does "not generally disturb the exercise of a trial court's discretion in denying a motion for new trial."). As the Court of Appeals iterated in *Buck v. Cam's Broadloom Rugs*, 328 Md. 51, 59, 612 A.2d 1294 (1992), "[b]ecause the exercise of discretion under these circumstances depends so heavily upon the unique opportunity the trial judge has to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal."

Appellants assert that errors regarding the admission of statements made by Johansson to his insurer and the weather reports warrant a new trial. These two bases advanced by appellants are, as we have previously discussed, evidentiary determinations within the trial court's discretion. Therefore, appellants must prove that the trial judge abused his discretion twice—once when he allowed the admission of the said evidence and then again, when he denied appellants' Motion for New Trial. We hold that appellants fail on both accounts.

The trial court properly permitted the cross-examination of Johansson's inconsistent statements. The cross-examination was probative in that it questioned appellants' motivation to pursue litigation against appellees only after all other avenues of financial recovery had been foreclosed. Appellees never suggested that appellants had been satisfied in whole or in part through their insurance carrier or prior litigation to implicate a collateral source issue. Additionally, the trial court properly admitted certified records from a government agency clearly indicating rainfall amounts in the Baltimore

area during the relevant period. The circuit court did not err in denying appellants' motion for new trial.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANTS.**