944 A.2d 1272

**NORFOLK SOUTHERN RAILWAY CORPORATION, et al.**

v.

**Henry TILLER.**

**No. 0667, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

March 31, 2008.

Frederick L. Kobb (Jason R. Potter, Wright, Constable & Skeen, LLP, on the brief), Baltimore, for Appellant.

Paul J. Riley (Barish, Rosenthal on the brief), Philadelphia, PA, Henry L. Belsky, Schlachman, Belsky & Weiner, PA, on the brief, Baltimore, for Appellee.

Panel: KRAUSER, C.J., ADKINS and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, retired, specially assigned.

The injured railroad employee in this case is doubly protected against the risk of diminution of his award for damages. As a successful plaintiff, he is protected by Maryland's collateral source rule generally. His protection is enhanced by that rule's favored status within the special context of the Federal Employers' Liability Act ("FELA").

## Procedural Background

The appellant is the Norfolk Southern Railway Corporation. The appellee, Henry Tiller, had been, as of the time of the accident, an employee of Norfolk Southern for 29 years and 5 months. On March 31, 2004, Tiller was struck on the head by the boom of a crane mounted on a wreck truck, then being operated by his supervisor. The injury was to Tiller's neck. He has been determined to be totally disabled and unable to return to work.

On September 13, 2005, Tiller brought suit under FELA in the Circuit Court for Cecil County, alleging negligence on the part of Norfolk Southern for not providing him a reasonably safe workplace. Prior to trial, Norfolk Southern conceded its negligence. Liability, therefore, is not an issue before us. Trial proceeded before Judge O. Robert Lidums and a jury, exclusively on the issue of damages. The jury awarded damages to Tiller in the amount of $1,001,278. Norfolk Southern has appealed from that award.

## The Appellate Issue

The single issue before us is the admissibility of certain evidence offered by Norfolk Southern bearing on the computation of damages. Prior to trial, Tiller filed a Time of Trial Motion to Limit the Testimony of Norfolk Southern's Economic Expert Witness Thomas Walsh. The motion sought to preclude Walsh from testifying that Tiller, who was at trial time 52 years of age, would be eligible to retire "with full benefits" at 60 years of age.[1] Judge Lidums granted Tiller's motion.

## Narrowing the Focus

The damages award was in the total amount of $1,001,278. That award was broken down into four subcategories:

Loss of past earnings . . . . . . . . $141,317
Past pain and suffering . . . . . . . $100,500
Future pain and suffering . . . . . $190,532
Loss of future earnings . . . . . . . $568,929

Accepting at face value the purpose for which Norfolk Southern sought to offer the evidence of Tiller's expected retirement benefits, that evidence would have had a bearing only on the fourth of the subcategories of damages, to wit, on Tiller's loss of future earnings.

The calculation is straightforward. Once the multiplicand of lost wages for the present year is established, the multiplier is then the number of years between the employee's current age and the age at which the employee would ordinarily have been expected to stop working if the injury had not occurred. That expectation inevitably involves some degree of speculation. A number of factors may enter into the making of what amounts to such an educated guess. One significant factor, of course, is the announced intention of the employee himself. Even if an employee is eligible to retire at age 60, he is not required to do so. Tiller testified that, prior to his injury, he had always thought that he would continue to work into his mid–

---

1. At age 60, Tiller will be entitled to disability and retirement benefits under the Railroad Retirement Act, 45 U.S.C., § 231a(a)-(b).

60's, probably stopping at about age 65. Looking ahead to age 65 from the then present age of just under 52 would have given the jury a multiplier of 13 years (and a few months).

Norfolk Southern's trial strategy, on the other hand, was to persuade the jury that Tiller was eligible to retire at age 60 and, therefore, would most likely retire at age 60. Looking ahead to age 60 from the then present age of just under 52 would have given the jury a smaller multiplier of 8 years (and a few months). A reduction in the multiplier from 13+ to 8+ would have reduced the product, the future lost wages, proportionately.[2] What Norfolk Southern was hoping to do, therefore, was apparent. It wanted to inform the jury that Tiller was eligible to receive retirement benefits at age 60 in order to persuade the jury that, notwithstanding his testimony to the contrary, he in all likelihood would have stopped working at age 60.

Norfolk Southern's contention that the evidence of retirement eligibility was erroneously excluded takes two forms:

1. The evidence generally was admissible; and
2. Even if presumptively inadmissible because of the collateral source rule, Tiller "opened the door" to its admissibility when his economic expert made a reference to Social Security benefits.

### The Special FELA Context

This is no ordinary tort case, although it has some characteristics thereof. It is a FELA case, and that designation places it in a special legal province all of its own with special rules of its own. Although FELA has been on the books for a full century, since 1908, the Maryland case law dealing with it remains skimpy. In *CSX v. Miller*, 159 Md.App. 123, 128–46, 858 A.2d 1025 (2004), we examined in depth its special characteristics. And see *Haischer v. CSX*, 381 Md. 119, 848 A.2d 620

---

**2.** Norfolk Southern's economic expert, however, based his ultimate prediction on a different predicate and came up with a different work-expectancy figure of 10.5 years.

(2004); *Bittinger v. CSX,* 176 Md.App. 262, 932 A.2d 1243 (2007). In *CSX v. Miller,* 159 Md.App. at 129, 858 A.2d 1025, we commented on one unusual feature of a FELA action:

The FELA law is a hybrid. It hovers ambivalently between workers' compensation law and the common law tort of negligence. It is neither, but it partakes of characteristics of both.

In *Kernan v. American Dredging Co.,* 355 U.S.426, 431–32, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958), Justice Brennan recounted the provenance of FELA as a deliberate policy recognition that the railroad industry itself was better able to shoulder the cost of industrial injuries and deaths than were the industry's injured workers or their families.

[I]t came to be recognized that, *whatever the rights and duties among persons generally, the industrial employer had a special responsibility toward his workers,* who were daily exposed to the risks of the business and who were largely helpless to provide adequately for their own safety. Therefore, as *industry and commerce became sufficiently strong to bear the burden, the law,* the reflection of an evolving public policy, *came to favor compensation of employees and their dependents for the losses occasioned by the inevitable deaths and injuries of industrial employment,* thus shifting to industry the "human overhead" of doing business. For most industries this change has been embodied in Workmen's Compensation Acts. In the railroad and shipping industries, however, the FELA and Jones Act provide the framework for determining liability for industrial accidents.

(Emphasis supplied).

In *Consolidated Rail Corporation v. Gottshall,* 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994), the Supreme Court more recently reaffirmed that energizing purpose of FELA:

Cognizant of the physical dangers of railroading that resulted in the death or maiming of thousands of workers every year, Congress crafted a *federal remedy that shifted part of*

*the " 'human overhead' " of doing business from employee to their employers.*

From FELA's history and its animating philosophy, this Court concluded in *CSX v. Miller*:

Thus, although the FELA is not a workers' compensation act, *the social forces that produced it and the generating spirit that drives it resonate with the language and philosophy of workers' compensation principles.*

159 Md.App. at 131, 858 A.2d 1025 (emphasis supplied).

## An Employee–Friendly Standard of Review

Routinely at the outset of an opinion, we make reference to the controlling standard of appellate review. It is particularly appropriate that we do so in a FELA case. Because of its midway position between a common law action in negligence and a workers' compensation claim, a FELA case calls for an interpretative approach that is significantly different from that which ordinarily prevails in a suit for common law negligence. As early as *Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 74 L.Ed. 1082 (1930), the Supreme Court set out a basic guideline:

The Act is not to be narrowed by refined reasoning. *It is to be construed liberally* to fulfill the purposes for which it was enacted.

(Emphasis supplied).

The Supreme Court's literal holding of *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949), does not concern us, but the psychological attitude with which it approached a FELA problem does. Without any clear textual predicate for doing so, the Supreme Court boldly asserted that FELA covered occupational diseases as surely as it covered accidental physical injuries. The text of the Congressional act itself by no means compelled such a sweeping result. The primary rationale advanced by the Court for so bold an expansion of FELA's coverage was the act's broad energizing purpose.

Considerations arising from *the breadth of the statutory language, the Act's humanitarian purposes, its accepted standard of liberal construction* in order to accomplish those objects, *the absence of* anything in the legislative history indicating *a congressional intent to require a restricted interpretation* or expressly to exclude such occupational disease, and the trend of existing authorities dealing with the question, *combine to support this conclusion.*

337 U.S. at 180–81, 69 S.Ct. 1018 (emphasis supplied). The Supreme Court summarized a series of its earlier liberal interpretations of FELA:

We think they were made in *the spirit the statute contemplated* for its administration and application. *That spirit is one not in conformity with importing nice distinctions in applying the act's broad and general terms or cutting down their full scope by inference or implication.*

337 U.S. at 186, 69 S.Ct. 1018 (emphasis supplied).

*Kernan v. American Dredging Co.*, 355 U.S. at 432, 78 S.Ct. 394, reconfirmed that interpretive approach to the FELA statute.

Congress saw fit to enact a statute of the most general terms.... *[I]t is clear that the general congressional intent was to provide liberal recovery for injured workers;* and *it is also clear that Congress intended the creation of no static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of industry's duty toward its workers.*

(Emphasis supplied). In that opinion, Justice Brennan further described the process by which the FELA would continue to evolve in order the better to provide "compensation for injuries to employees consistent with the changing realities of employment in the railroad industry."

Congress, in 1908, did not crystallize the application of the Act by enacting specific rules to guide the courts. Rather, *by using generalized language, it created only a framework within which the courts were left to evolve,* much in the manner of the common law, *a system of principles provid-*

*ing compensation for injuries to employees consistent with the changing realities of employment in the railroad industry.*

355 U.S. at 437, 78 S.Ct. 394 (emphasis supplied).

The drumbeat of liberal interpretation continued unabated in *Atchison, Topeka and Santa Fe v. Buell,* 480 U.S. 557, 562, 107 S.Ct. 1410, 94 L.Ed.2d 563 (1987):

*We have* recognized generally that the FELA is a broad remedial statute, and have *adopted a "standard of liberal construction in order to accomplish [Congress'] objects."*

(Emphasis supplied). *Consolidated Rail Corporation v. Gottshall,* 512 U.S. at 560–61, 114 S.Ct. 2396, added its "Amen" in 1994.

Relying upon "the breadth of the statutory language, [and] the Act's humanitarian purposes," *this Court has accorded the FELA a notably "liberal construction in order to accomplish [Congress'] objects."*

Dissenting opinion of Ginsburg, J. (emphasis supplied).

After surveying that unbroken line of the Supreme Court support for a FELA claim, this Court's *CSX v. Miller* observed with respect to the standard of appellate review:

In the wake of this juggernaut of language, consistently iterated and reiterated over the course of seven and one-half decades, *it is not hard to figure out who wins the ties and who gets the benefit of the close calls.*

159 Md.App. at 145, 858 A.2d 1025 (emphasis supplied). The standard of review is clear.

### The Collateral Source Rule

We sympathize with Norfolk Southern's evidentiary frustration. On the issue of the loss of future wages, the age at which the injured employee would have been expected to stop working, had the accident never occurred, is obviously very material. The employee's eligibility for retirement benefits at a particular age, moreover, is unquestionably relevant evidence as to the probable age at which the employee might

have been expected to stop working. The admissibility of such evidence, indisputably both relevant and material, is on a direct collision course, however, with the massive and imposing bulk of the collateral source rule. It is that collision of competing values that is the nub of this case. Which shall prevail? The basic collateral source rule? An arguable exception?

The collateral source rule in Maryland traces back at least as far as 1899. In *Baltimore City Passenger Railway Company v. Baer*, 90 Md. 97, 44 A. 992 (1899), the Court of Appeals, albeit not giving the rule a name, applied it in principle.

> The sixth prayer asserts the correct proposition that *any sick benefits received by the plaintiff from any source other than the defendant were not to be considered by the jury,* in making up their verdict.

90 Md. at 108, 44 A. 992 (emphasis supplied).

That principle was described as "well established" by 1913 when *Chesapeake Iron Works v. Hochschild,* 119 Md. 303, 307–08, 86 A. 345 (1913), stated:

> It is said in 38 *Cyc.* 537: "*It will be no defense that the injured party has been indemnified by insurance, although he has collected all or a part of such indemnity,*" and in 13 *Cyc.* 70: "The rule seems to be well established by the authorities that the fact of insurance can not be set up in mitigation of damages, whether such reduction is set up in mitigation in case of fire, life, marine or accident insurance." In the case of *City Pass. Ry. Co. v. Baer,* 90 Md. at 108[, 44 A. 992], this Court said: "The sixth prayer asserts the correct proposition that any sick benefits received by the plaintiff from any source other than the defendant were not to be considered by the jury, in making up their verdict."

(Emphasis supplied)

By 1916 the principle was taking on a respectable pedigree, as *American Paving and Contracting Co. v. Davis,* 127 Md. 477, 485, 96 A. 623 (1916), announced:

> Its fourth prayer asserted the proposition that if the plaintiff's house was insured, and he received the sum of $885.00

from the insurance company in payment of the loss caused by the fire, he was not entitled to recover, and is disposed of by the case of *City Pass. Ry. Co. v. Baer,* 90 Md. at 108[, 44 A. 992], where it was said: "The sixth prayer asserts the correct proposition that any sick benefits received by the plaintiff from any source other than the defendant were not to be considered by the jury, in making up their verdict," and the case of *Ches. Iron Works v. Hochschild,* 119 Md. 303[, 86 A. 345], where this Court said: "The rule seems to be well established by the authorities that the fact of insurance cannot be set up in mitigation of damages, whether such reduction is set up in mitigation in case of fire, life, marine or accident insurance."

See also *Barnes v. United Railways & Electric Co.,* 140 Md. 14, 116 A. 855 (1922); *Plank v. Summers,* 203 Md. 552, 561–62, 102 A.2d 262 (1954).

It was Judge Hammond's opinion for the Court of Appeals in *Leizear v. Butler,* 226 Md. 171, 175, 172 A.2d 518 (1961), that made it clear that the collateral source rule's general preclusive ban applies not just to the payment of insurance benefits but also to the payment of wages by an employer during an injured worker's period of disability.

Leizear contends (a) that it was prejudicial error for the trial court to admit evidence that he was paid his wages by Montgomery County during the period of his absence from work. . . . *The trial court correctly ruled that the amount of Leizear's damages was not to be reduced because of the payment of his wages by his employer during the period of disability due to the accident, Plank v. Summers,* 203 Md. 552, 102 A.2d 262, but, nevertheless, permitted Leizear to testify over objection that Montgomery County had paid him his regular salary during the time he was not working after the accident. Courts in other states have held that *such testimony is admissible if there is evidence in the case of malingering or exaggeration of injury but is inadmissible if there is no such evidence or if the question is asked*

*for the real purpose of mitigating the liability of the defendant.*

(Emphasis supplied).

*Kelch v. Mass Transit Administration*, 42 Md.App. 291, 296, 400 A.2d 440 (1979), reaffirmed that evidence of benefits from a collateral source is not admissible to diminish damages even though it may sometimes be admissible to prove that the plaintiff is malingering or exaggerating the extent of the injuries.

In *Leizear*, the Court of Appeals noted with approval that *the evidence of collateral payments is admissible if there is evidence in the case of malingering or exaggeration of injury* but *evidence as to collateral payments is inadmissible* in the absence of evidence of malingering or exaggeration or *where the real purpose* of the evidence offered as to collateral sources is the *mitigation of liability for damages* of the defendant.

(Emphasis supplied).

## The Rationale Behind the Rule

In holding that the collateral source rule was not applicable to a claim against the Motor Vehicle Administration and its Assurance Fund, *Motor Vehicle Administration v. Seidel*, 326 Md. 237, 254, 604 A.2d 473 (1992), quoted with approval from *Restatement (Second) of Torts* (1977), § 920A(2), Comment b, as the *Restatement* explained the salutary purpose behind the collateral source rule.

*"Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant.* The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But *it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the*

*benefit,* as by maintaining his own insurance or by making advantageous employment arrangements, *the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers.* The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him."

(Emphasis supplied). See also *Dennison v. Head Construction Co.,* 54 Md.App. 310, 319–22, 458 A.2d 868 (1983). In a nutshell, the evidence, though otherwise admissible, is deemed to do more harm than good. On balance, therefore, it is out!

### The Collateral Source Rule In FELA Cases

Although the collateral source rule has significant preclusive force in tort cases generally, it takes on added force in the special habitat of FELA litigation. For FELA cases, the handwriting, albeit obliquely italic, was placed on the wall by the Supreme Court in *Tipton v. Socony Mobil Oil Co., Inc.,* 375 U.S. 34, 84 S.Ct. 1, 11 L.Ed.2d 4 (1963). An injured worker brought suit against his employer under the Jones Act, a federal act applicable only to seamen but otherwise a mirror image of the FELA. The employer's defense was that the employee was not a seaman, who would have been covered by the act, but an offshore drilling employee, who was explicitly not covered by the act. The employer's evidence of non-coverage was the fact that the injured employee "had accepted compensation benefits under the Longshoremen's and Harbor Workers' Compensation Act," an act that was explicitly inapplicable to seamen. 375 U.S. at 34–35, 84 S.Ct. 1. The employee, the employer's argument ran, apparently considered himself, if he were being honest, as something other than a seaman. The evidence, therefore, was unquestionably relevant to help prove that the employee was not a seaman and was not eligible for coverage under the Jones Act. The United States Court of Appeals for the Fifth Circuit agreed with the employee, however, and ruled that the trial court's admission of the evidence as to the receiving of compensation benefits

was error, but it further found that the error was harmless. 315 F.2d 660. The Supreme Court noted:

The Court of Appeals for the Fifth Circuit unanimously held it error to have admitted the evidence of other compensation benefits but, with one judge dissenting, found the error harmless.

375 U.S. at 35, 84 S.Ct. 1.

The Supreme Court agreed with the Fifth Circuit that the admission into evidence of the fact that the employee was receiving compensation benefits was error, but it reversed the Fifth Circuit's conclusion that the error was harmless.

We do not agree that on the record in this case the error may be regarded as harmless. There can be no doubt that *the evidence of other benefits was pressed upon the jury. Throughout the trial respondent's counsel emphasized that the petitioner "has a remedy under a federal compensation act, and in fact received benefits in the form of weekly payments under that act . . . ."*

375 U.S. at 35, 84 S.Ct. 1 (emphasis supplied).

Although the direct concern in the *Tipton* case had been with liability rather than with damages, of broader import was the Supreme Court's recognition that a jury can readily misuse evidence of collateral benefits. *Eichel v. New York Central Railroad Co.,* 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963), followed *Tipton* within less than two months and recognized what *Tipton* had presaged:

We have recently had occasion to be reminded that *evidence of collateral benefits is readily subject to misuse by a jury. Tipton v. Socony Mobil Oil Co., Inc.* It has long been recognized that *evidence showing that the defendant is insured creates a substantial likelihood of misuse.* Similarly, we must recognize that the *petitioner's receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact.*

375 U.S. at 255, 84 S.Ct. 316 (emphasis supplied).

*Eichel* was a FELA case. The injured employee had been working for the New York Central Railroad for 40 years when

he suffered a permanently disabling injury allegedly as a result of the railroad's negligence. The jury found in his favor and awarded damages in the amount of $51,000. In an effort to show that the employee was malingering and that the injury was not permanent, the railroad offered evidence that the employee was receiving "disability pension payments under the Railroad Retirement Act." The evidence was for the express "purpose of impeaching the testimony of [the employee] as to his motive for not returning to work and as to the permanency of his injuries." 375 U.S. at 254, 84 S.Ct. 316. The trial judge excluded the evidence pursuant to the collateral source rule. The Court of Appeals for the Second Circuit, however, reversed the trial court and held that it had been "prejudicial error to exclude the evidence of the disability pension." 319 F.2d 12. The Supreme Court, in turn, reversed the Second Circuit.

In *Eichel*, as in the case now before us, the source of the collateral benefits was the Railroad Retirement Act of 1937, now codified as 45 U.S.C. § 231a(a)-(b). The Supreme Court made it clear that benefits received under the Railroad Retirement Act are benefits received from a collateral source and not benefits received from the defendant railroad *per se*. The Supreme Court, 375 U.S. at 254, 84 S.Ct. 316, quoted with approval from *New York, New Haven and Hartford Railroad Co. v. Leary*, 204 F.2d 461, 468 (1953):

> *"The Railroad Retirement Act is substantially a Social Security Act for employees of common carriers .... The benefits received* under such a system of social legislation *are not directly attributable to the contributions of the employer*, so they cannot be considered in mitigation of the damages caused by the employer."

(Emphasis supplied).

The use the defendant railroad sought to make of the disability pension benefits in *Eichel* was closely analogous to the use Norfolk Southern sought to make of the future pension benefits in this case. The New York Central was trying to show that the injured employee in that case had a

motive not to go back to work because he was then collecting disability pension benefits. Norfolk Southern was trying to show that Tiller would have had a motive for not continuing to work past age 60 because he could then have been collecting retirement pension benefits. In each case, the motive not to work because of benefits as an alternative to work was the same. We do not see the difference in the tenses as compelling a different result. The Supreme Court summarized the defendant railroad's argument in *Eichel:*

*Respondent argues that the evidence* of the disability payments, although concededly inadmissible to offset or mitigate damages, *is admissible as bearing on the extent and duration of the disability* suffered by petitioner. At trial *counsel* for respondent *argued that the pension would show "a motive for [petitioner's] not continuing work,* and for his deciding not to continue going back to work after the last accident."

375 U.S. at 254–55, 84 S.Ct. 316 (emphasis supplied). What in that case was offered as "bearing on the extent and duration of the disability" was in this case offered as bearing on the extent and duration of the work-life expectancy.

The Second Circuit had been persuaded by New York Central's argument that the probative value of the collateral benefits outweighed the potential misuse of the evidence. The Supreme Court summarized what the Second Circuit had concluded:

On the basis of this argument the Court of Appeals concluded that the disputed evidence should have been admitted because: "Its substantial probative value cannot reasonably be said to be outweighed by the risk that it will ... create substantial danger of undue prejudice through being considered by the jury for the incompetent purpose of a set-off against lost earnings.

*Id.* at 255, 84 S.Ct. 316.

The Supreme Court, however, reached a diametrically different conclusion.

We disagree. *In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence.* Insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension. Moreover, it would violate the spirit of the federal statutes if the receipt of disability benefits under the Railroad Retirement Act of 1937 were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act.

*Id.* (emphasis supplied).

For the applicability of the collateral source rule to a FELA case, *Eichel v. New York Central* has remained the gold standard for 45 years.

### Haischer v. CSX

But for an early and minor case on the legal sufficiency of the evidence to prove liability,[3] the only occasion that the Court of Appeals has had in those 45 years to consider a FELA question was in *Haischer v. CSX Transportation, Inc.,* 381 Md. 119, 848 A.2d 620 (2004). Although the claim for an accidental injury attributable to CSX's negligence was made directly pursuant to the Federal Boiler Inspection Act,[4] Judge Wilner's opinion for the Court of Appeals made it clear that "it has been held consistently that the Boiler Inspection Act supplements the Federal Employers' Liability Act [FELA] by imposing on interstate railroads 'an absolute and continuing duty' to provide safe equipment." 381 Md. at 125, 848 A.2d

---

3. In *Baltimore and Ohio Railroad Co. v. Davis,* 235 Md. 568, 202 A.2d 348 (1964), a 5–2 decision of the Court of Appeals held that the evidence of negligence was insufficient to go to the jury. In *Davis v. Baltimore and Ohio Railroad Co.,* 379 U.S. 671, 85 S.Ct. 636, 13 L.Ed.2d 594 (1965), the Supreme Court held that the evidence was legally sufficient. Justices Harlan and Stewart wondered what was conceivably certworthy about the case.

4. The name of the Act, which had first been enacted in 1911, was changed in 1994 from the Boiler Inspection Act to the Locomotive Inspection Act, but without any substantive changes in its actual provisions. It is now codified as 49 U.S.C., § 20701–03.

620. One of the two holdings of the Court of Appeals, moreover, dealt squarely with the collateral source rule in the context of a FELA case and engaged in a significant analysis of *Eichel v. New York Central.*

CSX sought to introduce evidence that the injured employee was receiving benefits 1) in an effort to prove that the employee was "essentially a malingerer" and 2) to refute the plaintiff's claim of impoverishment "by reason of his inability to work." 381 Md. at 128, 848 A.2d 620. The collateral benefits, just as in *Eichel,* were disability benefits from the Railroad Retirement Board. Relying on *Eichel,* the employee sought to have the evidence excluded pursuant to the collateral source rule. CSX countered that the trial judge "had some discretion" to admit the evidence under possible exceptions to the rule 1) to prove malingering or 2) to disprove an employee's claim of impoverishment.

Although couched in terms of his impoverishment, the employee claimed that he would probably have to continue working until he was 65. CSX sought to use the receipt of the benefits to disprove that fact. Judge Wilner referred to the employee's testimony as to his work-life expectancy.

The second segment of Haischer's testimony noted by CSX came when *he was asked how long he had planned to continue working for the railroad,* and he responded:

"Well, depending on how the economy went, and my 401K, I was putting the maximum into it, but the way things were stacking up, *it looked like I was going to have to go until I was 65.* Figuring my son would go to college, I would have to do that and I wanted some money set aside for my own retirement. *So I was pretty much figuring on 65.*"

381 Md. at 129, 848 A.2d 620 (emphasis supplied). The trial judge applied the collateral source rule and denied CSX's request to introduce evidence of the benefits. The jury found in favor of the employee, awarding damages in the amount o f $203,898, including $101,949 for lost wages. CSX first appealed to this Court. We reversed the judgment, holding that the

trial judge had been in error in excluding evidence of the benefits, and remanded for a new trial on the sole issue of damages. *CSX Transportation, Inc. v. Haischer*, 151 Md. App. 147, 824 A.2d 966 (2003). We held that the employee had "opened the door" for the introduction of evidence regarding "the annuity payments [he] is receiving" in two regards:

> As we see it, there are two separate areas of inquiry when an exception to the collateral source rule is suggested. *The cases recognize*, specifically and directly, *malingering as one area of inquiry. There is*, however, *a second*, and somewhat more subtle, area of question—that, is *where the plaintiff himself puts his strained or diminished financial condition into play.* We shall address both.

*Id.* at 163, 824 A.2d 966 (emphasis supplied).

In reversing this Court on that issue, Judge Wilner's opinion first set forth a basic statement of the collateral source rule.

> *The collateral source rule permits an injured person to recover the full amount of his or her provable damages*, "regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor." *Motor Vehicle Admin. v. Seidel*, 326 Md. 237, 253, 604 A.2d 473, 481 (1992). *The doctrine is widely accepted* (*see* Restatement 2d of Torts, § 920A(2) (1977) and comment b. thereto) *and rests on public policy considerations-principally that the wrongdoer should not receive a windfall because the plaintiff received a benefit from an independent source*, but also that, to the extent the collateral benefit arises from insurance maintained by the plaintiff, the rule encourages the maintenance of insurance.

381 Md. at 132, 848 A.2d 620 (emphasis supplied).

The opinion then looked to and summarized the *Eichel* opinion as the fountainhead of Supreme Court law on the collateral source rule in the context of a FELA case. Significantly, *Haischer v. CSX* did not read *Eichel* as "a matter of Federal evidence law," persuasively but not authoritatively establishing a balancing test between the basic rule of exclu-

sion and its possible exceptions. It seemed to view *Eichel* rather as announcing a substantive rule of law, "at least as to [the] malingering" that had been the literal issue before the *Eichel* court.

Two aspects of the *Eichel* decision are important. First, though using a balancing approach, *the Court did not view the admissibility of this kind of evidence as discretionary on the part of the trial court*, as Justice Harlan did in a concurring and dissenting opinion and as would be the case if the issue were controlled by Fed.R.Evid. 403 or its common law antecedent, *but ruled as a matter of substantive law that the danger of misuse outweighed any probative value of the evidence*, at least as to malingering. *Most courts seem to have viewed the ruling in Eichel that way and have not applied, or even purported to apply, a discretionary balancing approach.*

*Id.* at 133, 848 A.2d 620 (emphasis supplied).

Judge Wilner's opinion reviewed the overwhelming weight of authority accepting the *Eichel* ruling as binding substantive law. The opinion noted, however, that whether Maryland followed suit or not "is of little consequence," because the *Eichel* treatment of the collateral source rule as substantive law in a FELA context, in any event, conforms completely with Maryland's historic treatment of the collateral source rule generally.

[A]lthough we have not previously addressed the issue precisely, the *Eichel view that collateral source evidence is substantively inadmissible is consistent with decisions of this Court regarding such evidence. See Motor Vehicle Admin. v. Seidel.*

*Id.* at 134, 848 A.2d 620 (emphasis supplied).

The *Eichel* statement of the collateral source rule would thus be applicable in a Maryland FELA case by either or both of two parallel routes.

Because *we have adopted the collateral source rule as part of our own substantive law, whether we view the Supreme Court's ruling in Eichel as a matter of substan-*

*tive Federal law* that we are obliged to apply under the Supremacy Clauses in both the Federal and Maryland Constitutions or, as the *McGrath [v. Consolidated Rail Corp.,* 136 F.3d 838 (1st Cir.1998) ] court did, as a matter of Federal evidence law that we are not obliged to follow *is of little consequence. The principle underlying the Eichel ruling is entirely consistent with that underlying our adoption of the collateral source rule, and so we hold, as a matter of State law and subject to the discussion below, that evidence of a plaintiff's receipt of Railroad Retirement benefits is ordinarily inadmissible to show possible malingering on the part of the plaintiff.* As the *Eichel* Court noted, *there is,* on the one hand, *too much danger that the jury might use such evidence for the impermissible purpose of mitigating damages,* and, on the other, alternative ways of showing malingering that do not carry that danger. *To the extent that the Court of Special Appeals found the collateral source evidence admissible to show malingering on Haischer's part, it erred.*

*Id.* (emphasis supplied).

Although rejecting malingering as a possible exception to the collateral source rule, essentially as a matter of law, the Court of Appeals accepted the refutation of a plaintiff's false claim of financial distress as a possible limited exception to the collateral source rule's exclusionary ban.

Notwithstanding the language used in *Eichel, most courts faced with the issue have concluded that there are certain limited exceptions to the inadmissibility of collateral source evidence in FELA and BIA cases.* The one at issue here is that, *if the plaintiff claims,* in argument or through the introduction of evidence, *that he/she is in financial distress* due to the injury arising from the railroad's negligence or violation of BIA *and has no other sufficient source of income, evidence that the plaintiff is receiving Railroad Retirement benefits is admissible to rebut that claim.* That evidence, the courts have held, may be used "for the narrow purpose of testing the credibility of plaintiff's assertion regarding financial distress."

*We agree that use of such evidence for that limited purpose is proper. The question then becomes whether Haischer,* through the argument and evidence noted, *opened the door to the admission of that evidence*—whether he, in fact, asserted a level of poverty that was misleading.

381 Md. at 135, 848 A.2d 620 (emphasis supplied).

The Court of Appeals held that, on balance, the employee had not "opened the door" to evidence of benefits from the Railroad Retirement Board by any false or deceiving evidence of impoverishment. Pertinent to the issue now before us is the Court of Appeals's holding that the employee's testimony about "his previous intention of continuing to work until he was 65" and the necessity of such evidence "to establish the amount of his wage loss" did not constitute an opening of the door to evidence of collateral benefits.

*In testifying regarding his previous intention of continuing to work until he was 65,* in order to put additional money aside in his 401K plan and pay for his son's college education, Haischer did not say that, in his present circumstances, he would not be able to afford to send his son to college. *Evidence as to his expected work-life is not only relevant but necessary to establish the amount of his wage loss. If that kind of evidence suffices to trigger collateral source evidence, there would be nothing left of the collateral source rule. See Leake v. Burlington N. R.R. Co., supra,* 892 S.W.2d 359, 363 [Mo.App.1995] *(court erred in admitting collateral source evidence based on plaintiff's testimony that he would have had to work 14 more years to retire ).*

*Id.* at 137, 848 A.2d 620 (emphasis supplied).

### Evidence As To Expected Retirement Age No Exception To Collateral Source Rule

Although *Haischer v. CSX* was not dealing directly with the issue of future lost wages, its language touched very squarely on an employee's testimony as to the age until which he intended to continue working and on the inadmissibility of collateral benefits as counter evidence on that subject. We

repeat two sentences from the immediately preceding quotation.

> Evidence as to his expected work-life is not only relevant but necessary to establish the amount of his wage loss. If that kind of evidence suffices to trigger collateral source evidence, there would be nothing left of the collateral source rule.

If that be dicta, it is dicta that is exceedingly hard to ignore or even to deflect. Quite aside from the fact that it reflects our natural inclination in any event, we are persuaded by it.

 We hold (and this is not dicta) that evidence of future retirement or pension benefits is not admissible on the issue of when an employee, but for the accident, would have been expected to stop working. The probative value is too attenuated to offset the potential misuse that the jury could make of the evidence. Evidence bearing on the expected work-life of the employee is not a cognizable exception to the collateral source rule.

### The Caselaw Supports This Conclusion

The limited caselaw dealing directly with the issue now before us squarely supports the position we take. In *Griesser v. National Railroad Passenger Corporation*, 761 A.2d 606 (Pa.Super.2000), a FELA case, the computation of future lost wages was a key factor in the assessment of damages. The injured employee was 45 years of age. His economic expert's calculation as to future lost earning capacity was based on an expected retirement age of either 65 or 70. The defendant railroad sought to counter that evidence by showing that the employee would be eligible to retire at age 60 with full pension benefits. The trial judge admitted that evidence as an exception to the collateral source rule. In reversing the trial court, the Pennsylvania intermediate appellate court posed the issue in terms that precisely describe the issue now before us.

> *Appellant argues that* because he is permanently disabled, *he is entitled to lost wages until the usual age of retirement (either 65 or 70).* Implicit in this argument is

that, but for the injury, Appellant would have worked until age 65 or 70. *Amtrak presented evidence that if Appellant had continued working at Amtrak until age 60, he would have been able to retire with benefits equivalent to a full salary.* Thus, Appellant had an incentive to retire at age 60 even if he had not been injured. Consequently, *Amtrak argues, the assumption that he would have worked until age 65 or 70 is faulty.*

761 A.2d at 610 (emphasis supplied). The Pennsylvania court held squarely that evidence of future retirement benefits offered to show that the employee had a motive to retire before age 65 was inadmissible by virtue of the collateral source rule.

*[W]e conclude that evidence of Appellant's future retire-ment benefits was inadmissible to show that Appellant had an economic incentive to retire before age 65,* because of the danger that the jury would use this evidence for the improp-er purpose of mitigating Appellant's damages or reducing Amtrak's liability. In this way, *we adhere to the underlying purpose of the collateral source rule in light of the strong policy against the admission of collateral benefits in FELA cases.*

*Id.* at 612–13 (emphasis supplied).

In *Brumley v. Federal Barge Lines, Inc.,* 78 Ill.App.3d 799, 33 Ill.Dec. 609, 396 N.E.2d 1333 (1979), a Jones Act case indistinguishable from a FELA case, the defendant sought to introduce evidence of retirement benefits to demonstrate the employee's motivation to retire at age 65. The Illinois Court of Appeals affirmed the decision of the trial court to exclude such evidence pursuant to the collateral source rule.

*Defendant* does not dispute the validity of this rule but *argues that evidence of retirement and pension benefits were admissible for the limited purpose of demonstrating Brumley's motivation to retire at the age of 65.* We disagree. The United States Supreme Court opinions in *Tipton v. Socony Mobil Oil Co., Inc.* and *Eichel v. New York Central R.R. Co.,* we believe, reflect a strong policy

against the admissibility of this kind of collateral source evidence in F.E.L.A. and Jones Act cases.... In *Eichel*, a F.E.L.A. case, the Supreme Court held that the trial court properly excluded evidence of disability benefits received by plaintiff under the Railroad Retirement Act. *Defendant had argued that the disability benefits, though inadmissible to offset or mitigate damages, were admissible to show plaintiff's motive for not returning to work and the extent and duration of the disability.*

33 Ill.Dec. 609, 396 N.E.2d at 1339 (emphasis supplied).

The Illinois Court of Appeals had no difficulty in equating both social security or other retirement benefits with disability benefits and in excluding them all.

The same policy considerations that warrant the exclusion of disability benefits apply equally to the present controversy. *The possibility of prejudice resulting from the admission of social security and retirement benefits is readily apparent. The jury could easily confuse the purpose for which such evidence was admitted.* Furthermore, the fact that the Jones Act creates a federal cause of action suggests that the application of the collateral source rule, normally a question of state law, is in the present context a matter of federal law. Accordingly, *the broadly based federal policy expressed in Eichel and Tipton precluding the admission of collateral benefits in Jones Act and F.E.L.A. cases is controlling.*

*Id.* 33 Ill.Dec. 609, 396 N.E.2d at 1340 (emphasis supplied). See also *Leake v. Burlington Northern Railroad Company,* 892 S.W.2d 359, 363 (Mo.App.1995).

### How Collateral Is "Collateral"?

■ Norfolk Southern in this case strains mightily to exempt its evidence of Tiller's future retirement benefits from the coverage of the collateral source rule. It relies on a literal interpretation of the earlier classic statements of the rule. A typical early statement was that the rule precluded the admission of evidence of benefits received by the plaintiff 1) as

compensation for the injury itself and 2) proceeding from a collateral source, to wit, an outside source, a source other than the defendant.

█ Seizing upon such a statement of the rule, Norfolk Southern argues 1) that the future retirement benefits in issue are not compensation for Tiller's injury and 2) that the source of the retirement benefits is Norfolk Southern itself and not some outside or collateral source. The flaw in Norfolk Southern's argument is that the collateral source rule has over the course of the past hundred years been expansively interpreted and liberally applied for the benefit of plaintiffs, especially in FELA cases. A more accurate modern statement of the rule would be that it precludes the admission of evidence of benefits received by the plaintiff, other than compensation for the injury from the defendant itself, when such evidence could be misused by the jury to reduce an award because of its belief that the plaintiff was not in as dire financial straits as might otherwise have seemed to be the case.

The *Griesser v. National Railroad Passenger Corporation* case itself dealt with the argument that retirement benefits are not covered by the collateral source rule because they are not benefits literally received for the injury. The opinion recognized and posed the issue:

> The instant case presents a more attenuated link between the injury and the benefits at issue. *The benefits at issue are future retirement pension benefits and not current disability benefits. Thus, the benefits are not related to the injury* .... No Pennsylvania state case has decided whether evidence of benefits not related to the injury is barred by the collateral source rule.

761 A.2d at 610 (emphasis supplied). Notwithstanding the fact that such evidence was not "classic collateral source evidence," it was nonetheless held that the collateral source rule unquestionably applied.

> We understand that future retirement benefits are not triggered by the injury; rather, they would have been awarded even if Appellant had not been injured. Moreover,

future retirement benefits do not improperly suggest that the plaintiff is currently being compensated for his injury from another source. In these respects, *the evidence at issue is not "classic" collateral source evidence.*

On the other hand, *there remains a significant danger that a jury will misuse and misinterpret evidence of early retirement benefits.* For example, the jury could conclude that Amtrak was liable for lost wages to age 65 or 70, but then decline to award such damages because of the fortuitous existence of equivalent retirement benefits. Or, the jury could conclude that Appellant was entitled to benefits only to age 60 and was attempting to seek a double recovery of benefits after age 60. In short, *this evidence distracts the jury from the issues in the case and has a strong likelihood of prejudicing the plaintiff.*

*Id.* at 612 (emphasis supplied).

In a similar haggle over how strictly "collateral" something had to be to invoke the coverage of the collateral source rule, the defendant railroad in *Laird v. Illinois Central Gulf Railroad Co.*, 208 Ill.App.3d 51, 153 Ill.Dec. 94, 566 N.E.2d 944 (1991), claimed that benefit payments under the Railroad Retirement Act were payments from the railroad itself and, in that sense, were direct rather than literally collateral.

*Defendant claims that the Railroad Retirement Act disability annuity payments are directly attributable to contributions of the employer and therefore not collateral* because the railroad contributes approximately two-thirds of the annual total contributions under the present funding provisions.

153 Ill.Dec. 94, 566 N.E.2d at 955 (emphasis supplied). The Illinois Court of Appeals, however, rejected that argument without difficulty.

*Railroad Retirement Act disability payments are considered pension benefits which amount to compensation for services previously rendered* because it is the length of service and monthly wage rather than the extent of disability that determines the amount of the annuity. *We therefore*

*consider the disability annuity payments made to plaintiff to be collateral source payments,* and conclude accordingly that the court below did not err in disallowing evidence about these payments.

*Id.* 153 Ill.Dec. 94, 566 N.E.2d at 956 (emphasis supplied).

The seminal *Eichel v. New York Central* case itself spoke to the same effect as early as 1963 with respect to retirement benefits under the Railroad Retirement Act.

> *The benefits received under such a system* of social legislation *are not directly attributable to the contributions of the employer,* so *they cannot be considered in mitigation of the damages caused by the employer.*

375 U.S. at 254, 84 S.Ct. 316 (emphasis supplied). *See also Mahon v. Reading Co.,* 367 F.2d 25, 30 (3rd Cir.1966) (noting in *dicta* that evidence of unemployment benefits was inadmissible for any purpose in a FELA case and observing that "any benefits paid by the Railroad Retirement Board ... cannot be taken advantage of by defendant to mitigate the damage or otherwise.")

As far as the future retirement benefits from the Railroad Retirement Act in this case are concerned, the collateral source rule is alive and well.

### A Factual Non–Starter

■ In what purports to be a second contention, Norfolk Southern now claims that the "door was opened" by the following passage in the direct examination of Tiller's economic expert.

Q. Now, *how is work life expectancy determined?* You told us how life expectancy is determined. *Is there a way to determine the person's work life expectancy?*

A. *Yes. Often times it comes from the person themselves.* They may indicate a desire to work, let's say, to age 65, which is or was considered normal retirement. Actually mandatory retirement. That has since changed. People can work beyond 65. *With respect to government programs, you can begin collecting Social Security at age 67 if*

*you are born after 1960.* And people can work well beyond 65. So in this situation his work life is measured as the number of years between the current date and age 65, which would result in 13.4 years.

Q. Now, based upon the date of birth that I have already given you for Mr. Tiller, what is his work life expectancy?

A. *If Mr. Tiller worked to 65, that would be 13.4 years since he's 51.6 today.*

(Emphasis supplied).

We can mercifully shortcut this discussion, because this "second contention" is factually a non-starter. Norfolk Southern's almost paranoidal reading of that snippet of testimony is that the expert, inadvertently or advertently, gave the false impression that Tiller was eligible for Social Security benefits (he was not) but that he would not be able to draw those benefits until he was 67 years of age. That false impression, Norfolk Southern argues, "opened the door" for what might otherwise have been inadmissible evidence as to Tiller's eligibility for retirement benefits.

We cannot massage or tweak such a message out of the testimony, and we cannot conceive of any rational juror or other auditor getting such a reading out of it. The economist was asked to explain how economists generally reach a conclusion about work-life expectancy. In his response, he was simply trying to explain the process to the jurors in terms that the jurors might be familiar with and understand. The Social Security System was a convenient and widely understood example. The expert was clearly not referring to Tiller, who had been born before the critical cut-off date of 1960 and to whom the 67–year–old Social Security retirement age had absolutely no application. The example, using age 67 as the eligibility date for Social Security, obviously did not make reference to Tiller, for in his very next answer the expert posited Tiller's expected age of retirement as 65, not 67.

Our response to the "second contention" is precisely the same as was our response to the first contention. The evidence was properly excluded.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.